SKIL CORPORATION, Plaintiff,

v.

LUCERNE PRODUCTS, INC. et al., Defendants.

Nos. C 69–461, C 74–121.

United States District Court,
N. D. Ohio, E. D.

Feb. 22, 1980.

MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

The consolidated cases, C 69–461 and C 74–121, sound in suit for royalties under a licensing agreement and patent infringement. The issues are centered upon two patents owned by plaintiff—U. S. Patent No. 3,209,228, in the name of Alex F. Gawron ("Gawron Patent"), titled "System For Controlling Electric Motors in Power Tools and The Like;" and U. S. Patent No. 3,260,-827 in the name of Carl J. Frenzel ("Frenzel Patent"), titled "Motor Reversing Mechanism For Electrically Powered Portable Tools."

These consolidated cases were referred to the Honorable Jack B. Streepy, Magistrate for the United States District Court, Northern District of Ohio, Eastern Division. 28 U.S.C. § 636(b)(2). Magistrate Streepy was authorized by this Court, with the written permission of the parties, to try these cases as a special master under the provisions of Rule 53 of the Federal Rules of Civil Procedure.

The Magistrate conducted a twenty-one day trial, which developed over 3600 pages of testimony and over 400 exhibits. He considered proposed findings of fact and conclusions of law from both parties and extensive posttrial memoranda. The result was a well-reasoned, concise and clear Report and Recommended Decision, filed with the Court on March 9, 1979.

On March 19, 1979, defendants[1] filed "Objections of Defendants to the Magistrate's Report Filed on March 9, 1979" with this Court. This document is a shocking display of groundless *ad hominem* attacks on the Magistrate, crude solecisms, and incoherent analysis and argument.[2] The memorandum alleges a "pattern of prejudiced rationalization" in the actions of the Magistrate, and refers to his actions in preparing the report as "chicanery." These attacks are not supported by any evidence other than the fact that the Magistrate, in reaching his conclusion, decided certain legal issues contrary to the wishes of defendant. This Court readily acknowledges defense counsel's expertise in the field of patent law and continues in its respect for counsel's legal abilities and reputation in the legal community; therefore, the Court can only conclude that counsel was driven to this excess by the length, difficulty and unfavorable result of the hearing—and this is understandable. However, the Magistrate's reputation is questioned by these attacks, and the allegations are certainly undeserved. Therefore, this Court directs that all passages in defendant's memoranda that make personal attack upon the Magistrate beyond the parameters of legal argument and analysis be stricken. Federal Rules of Civil Procedure, Rules 7(b)(2) and 11.

## I.

Rule 53(e)(2) provides that "the court shall accept the master's findings of fact unless clearly erroneous." Professors Moore and Lucas explain the purpose of the rule in this way:

> The mandate of Rule 53(e)(2), as applied in the typical case where the master who makes the findings of fact is the one who heard the parties and the testimony is based on hard common sense: the master, as a judicial officer, must as a general proposition be trusted as to factual mat-

---

**1.** It is unclear whether all defendants or merely defendant Lucerne filed the document labeled "Objections of Defendants to the Magistrate's Report Filed on March 9, 1979." The title of the document indicates several defendants, yet the language of the memorandum refers only to defendant Lucerne. Given that the other defendants were not adversely treated by the recommendations of the Magistrate, the memorandum appears to be Lucerne's doing.

**2.** To give one of many examples, and this not the most offensive of the lot, the following paragraph from the memorandum (p. 4) is offered. It purports to be an explanation of defendant's objection to the abbreviation by ellipses of a quotation in the Magistrate's report from *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945):

> Patentably [sic] that conclusion could not be made *if* the omitted sentences in the Precision Instruments case *had been included.*

> The omissions were deliberately designed and used to emasculate the law as laid down by the Supreme Court and used to cover up the fraud of the plaintiff herein with the Cloak of Justice.

> Now when these omissions are coupled with the previous item of "Priority of Invention" a pattern of prejudiced rationalization appears which taints the entire Report of the Magistrate. Unfortunately, there are times when overzealous counsel resorts [sic] to such tactics, but surely this cannot be excused as an innocent oversight when resorted to by an officer of the Court charged with the duty to apply the principles laid down by the highest court in the nation. We therefore object to the above conclusions as being contrary to law, and look to this Court to take the proper measures to rectify this abuse of justice by the chicanery of its hearing officer as hereinabove disclosed.

ters, particularly those involving oral and disputed testimony. [5A Moore's Federal Practice ¶ 53.12[4] (1979), footnotes omitted.]

Thus, it is inappropriate for this Court to retry the case—to reexamine all of the evidence and reweigh it—unless defendant can make an initial showing that the Magistrate made a clearly erroneous appraisal of the weight of the evidence.

■■■ Defendant's objections to the findings of fact, however, do not go to the heart of the clearly erroneous appraisal standard. Defendant's initial objections are to those findings relating to the nonobviousness of the Gawron patent in the light of the state of prior art in 1962. The Magistrate found that the use of human feedback in a variable-speed trigger tool to obtain a constant rotational speed was not obvious to one skilled in the art at the time of the patent's approval. [Finding 8(c), Magistrate's Report (hereafter, "MR").] The Magistrate reached this conclusion by carefully comparing all prior related patents with the Gawron patent and by considering the testimony of various experts, all of which resulted in substantial evidence in support of a finding of nonobviousness. Defendant may disagree with the weight given to various evidence and testimony by the Magistrate, but this is not cause for a finding of "clearly erroneous" by this Court. Defendant seeks to have the Magistrate's findings specifically state all of the evidence presented by defendant in this matter, but this is not the purpose of the Findings of Fact. The Magistrate is granted authority to weigh and sift the evidence and then to distill the evidence into a summary of the material facts upon which conclusions of law may be based. So long as there is substantial evidence on the record to support this distillation, this Court may not discard it. The Court has carefully gone over the record and finds substantial support for the Findings made by the Magistrate.

The same problem is present in defendant's remaining objections to the Findings of Fact. Defendant disputes the weight given by the Magistrate to the various documents, evidence and testimony offered, and complains that the Magistrate failed to include all the evidence presented by defendant into the Findings of Fact. As explained above, these arguments are not appropriate to this Court's decision to accept and adopt the Findings of the Magistrate, *vel non*. The Court has carefully considered the record, and finds that there is substantial support therein for the Findings of the Magistrate.

## II.

■■■ A different standard of review applies to the Magistrate's Conclusions of Law. These have no effect except to the extent that they are correct propositions of law. 5A Moore's Federal Practice ¶ 53.12[5] (1979). Defendant's objection to the Conclusions of Law are based upon the Magistrate's analysis of *Precision Investment Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), which case deals with the defense of fraud on the patent office in a patent infringement action.

Defendants argue that several examples of fraud by plaintiff can be found in the circumstances of the Gawron patent application. Most of these examples have a common nexus—the failure of plaintiff to disclose defendant's device to the patent office when seeking the Gawron patent.

In early March of 1965, both plaintiff and defendant had patent applications for the Gawron-type device pending. The patent examiner had twice rejected plaintiff's patent application, and the parties decided to enter into an agreement in furtherance of their mutual interests respecting the pending patents. [MR, p. 19]. Negotiations culminated in an agreement dated March 9, 1965, between Skil and Lucerne that provided that parties would disclose evidence relating to patent rights to each other. The parties would then decide if they could agree on the import of the evidence; failing agreement, parties would ask the Patent Office to set up an interference to determine patent rights. [MR, pp. 19–20]. They disclosed their respective patent applica-

tions to each other on the day the agreement was concluded.

On March 16, 1965, plaintiff demonstrated its device to the patent examiner by operating a variable-speed-control drill that incorporated plaintiff's claimed invention. The invention was embodied in a Lucerne speed control device that plaintiff had purchased from defendant Lucerne. Apparently, the examiner was not informed that Lucerne had made the device for Skil. Six days later, plaintiff again amended its application and, this time, the application was allowed by the examiner. On May 20, 1965, Mr. Gawron executed a supplemental oath, stating in part that ". . . he does not know and does not believe that the same [Gawron invention] was even known or used before his invention thereof." [MR, pp. 20–21].

■ The Magistrate began his thorough analysis of these facts by pointing out that the Sixth Circuit deals with the fraud defense by requiring that the party asserting the defense prove "specific intent", that is, intent to defraud. *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365 (6th Cir. 1977); *Kolene Corporation v. Motor City Metal Treating Inc.*, 440 F.2d 77 (6th Cir. 1971), *cert. den.*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169. Further, the specific intent must be associated with a material matter. *Schnadig Corporation v. Gaines Manufacturing Co., Inc.*, 494 F.2d 383 (6th Cir. 1974).[3]

■ Defendant admits that this statement of the law is correct [see footnote 3, *supra*], and also does not dispute or object to the Magistrate's Findings of Fact on this issue. Defendant builds its argument on the following language from *Precision Instrument*, especially the emphasized sentence:

Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue. [citations] *This duty is not excused by reasonable doubts as to the sufficiency of the proof of the inequitable conduct nor by resort to independent legal advice.* Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office which can then pass upon the sufficiency of the evidence. [324 U.S. at 818, 65 S.Ct. at 999, emphasis added.]

Defendant argues that plaintiff's failure to disclose the pendency of the Lucerne application cannot be justified by plaintiff's assertion that, despite an agreement by defendant to give plaintiff evidence of reduction to practice and first inventorship, no evidence was forthcoming. Given the Magistrate's determination that the Lucerne device was covered by the Gawron patent application terms and that the device was ordered by Skil and produced by Lucerne with Skil's advice and assistance[4], this Court fails to see how the Patent Office could have been misled as to the claims of the Gawron Patent by failure of Skil to reveal who had produced the demonstration device.[5]

■ With respect to Lucerne's claim that Skil failed to reveal the pendency of the Lucerne application to the patent examiner, it is true that a failure "to call attention to material and relevant prior art" will support a defense of fraud. *Buzzelli v. Minnesota Mining & Manufacturing Co.*,

3. Defendant admits that these tests—specific intent and materiality—are essential to the fraud defense doctrine on pages 7, *et seq.* of its initial memorandum of objections. Defendant, in fact, cites and quotes *Norton v. Curtiss*, 433 F.2d 779, 57 CCPA 1384 (1970), for these rules of law.

4. Magistrate's Report, p. 17, Finding # 31. Note that Skil even supplied some of the production equipment.

5. Keep in mind that all actions of Skil prior to November 24, 1964, are irrelevant here because the patent examiner denied the application as amended on that date, and thus, actions prior to that date could not be material to the later acceptance of the application.

521 F.2d 1162, at 1163 (6th Cir. 1975). *Buzzelli* in fact quotes the passage from *Precision Instrument* on which defendant has based its claim. However, defendant has misanalyzed the sentence emphasized in the quotation, *supra*, from that passage. That sentence explains that a mere showing that plaintiff had doubts about the relevance of a pending application or relied on legal advice, does not, of itself, excuse a failure to reveal; yet, it would be ludicrous to assume that an applicant is therefore required to reveal all applications that could conceivably be argued to have some relationship to the patent being urged. The passage shows only that legal advice is not *per se* an excuse from charges of fraud.

In fact, *Buzzelli* suggests that the prior art must be shown to have been material and relevant before a failure to reveal would be considered fraudulent. The Findings of the Magistrate make it clear that the Lucerne application did not meet these criteria. The heart of the matter is the invention date of the Lucerne device. If the Lucerne date preceded Gawron's invention, the Lucerne application was material to the Patent Office. If not, the Lucerne invention date made no difference. The later date of the Lucerne invention, then, makes disclosure immaterial. *See, H. K. Porter Co., Inc. v. Gates Rubber Co.*, 187 U.S.P.Q. 692 (D.C.Colo.1975). The matter is brought into sharper perspective when it is remembered that Skil first learned of the Lucerne device in early 1964, nearly sixteen months after filing the Gawron application. During the next twenty months, up to the date the Gawron patent was granted in September of 1965, Lucerne failed to provide Skil with any documentary evidence that the Lucerne device preceded the Gawron application date. Lucerne did no more during this period than claim priority, a claim that, under the circumstances, Skil had reasonable cause to doubt. In fact, Lucerne's counsel essentially conceded in July of 1965 that no proof of prior invention had yet been produced. [MR, p. 57.]

## III.

On March 14, 1979, the Magistrate ordered that the 1977 counterclaim antitrust issues be severed from this case and that a previously issued 1977 order staying all proceedings as to those counterclaims be terminated. Defendants objected to the appropriateness of this action by the Magistrate and he therefore rephrased the Order of March 4 into a Report and Recommendation of April 17, 1979. The Court sees the wisdom of such an Order in promoting efficiency within its docket. Rule 42(b) of the Federal Rules of Civil Procedure.

## IV.

The Court hereby adopts in full and without change or exception the Report and Recommendation of the Magistrate of March 9, 1979, and the Report and Recommendation of the Magistrate of April 17, 1979. These Reports are attached hereto as Appendices A and B and are made a part hereof and their recommended actions shall be the Order of this Court. This Court commends the Magistrate for a careful and thorough examination of the facts and the law.

IT IS SO ORDERED.

## REPORT AND RECOMMENDED DECISION OF MAGISTRATE

JACK B. STREEPY, United States Magistrate.

This consolidated action was referred to the magistrate, with consent of the parties, to conduct pretrial and trial proceedings as a master, pursuant to 28 U.S.C. § 636. Based upon the evidence taken during a twenty-one day trial I recommend the following. References to the record are not exhaustive. Any matter set forth in the Discussion and Conclusions of Law deemed to be a Finding of Fact is hereby incorporated into its appropriate designation.

## FINDINGS OF FACT

### The Actions and the Parties

1. The issues in this consolidated action revolve around two patents owned by the

plaintiff, Skil Corporation (Skil). Those patents are: (1) U.S. Patent No. 3,209,228, in the name of Alex F. Gawron (the Gawron patent), titled "System For Controlling Electric Motors In Power Tools and The Like" (Plaintiff's Exhibit, hereafter PX, 1); and (2) U.S. Patent No. 3,260,827 in the name of Carl J. Frenzel (the Frenzel patent), titled "Motor Reversing Mechanism For Electrically Powered Portable Tools" (PX 24). Mr. Gawron and Mr. Frenzel have assigned their respective patents, and all rights therein to Skil. (PX 3, 26; Pretrial Stipulation, hereafter Stip., paras. 12, 13).

2. In action C 69–471 Skil has sued Lucerne Products Inc. (Lucerne) and Mr. Benjamin H. Matthews for royalties in a four count complaint. The parties are of diverse citizenship (Stip., paras. 1, 2, 6). The complaint essentially contends that Skil entered into licensing agreements with the defendants concerning the Gawron and Frenzel patents, that the defendants have failed to pay due and owing royalties, and that the defendants have erroneously contended that certain devices which they manufacture are not covered by the patents.

3. In action C 74–121 Skil has sued Lucerne; Mr. Matthews; the Millers Falls Company (Millers Falls), now a division of defendant Ingersoll-Rand Company; Wen Products, Inc. (Wen); and Rockwell Manufacturing Company, now Rockwell International Corporation (Rockwell). The action is a one count complaint alleging that the defendants have infringed the Gawron patent.

4. In their responses to the complaints the defendants have raised numerous issues, including whether the Gawron and Frenzel patents are valid, whether there has been infringement of the Gawron patent, whether certain devices are covered by the Gawron and Frenzel patents, whether Skil committed fraud upon the Patent Office in obtaining the Gawron and Frenzel patents, whether Skil engaged in patent misuse concerning the Gawron and Frenzel patents, and whether Skil legally declared the license agreement concerning the Gawron patent to be cancelled.

## THE GAWRON PATENT

### Nonobviousness

5. The Gawron patent consists of four claims. Each claim is a combination of elements which includes: (1) an appropriate electric motor, (2) a silicon controlled rectifier (SCR) speed control circuit, (3) a trigger, and (4) human feedback. These elements are combined to achieve the desired goal of speed control, which, as applied to a universal motor driven hand drill, is comprised of three distinct elements: (1) original selection of an appropriate drill speed (rpm) for a particular drilling operation; (2) maintaining that drill speed during operation as the load on the drill varies; and (3) changing the original drill speed while the drilling operation is being performed if a second drill speed becomes more appropriate. The SCR speed control circuit permits the drill to be operated within a relatively wide range of speed. Manipulating the trigger sets the desired speed. Once the drilling begins the operator's human senses (human feedback) tell him whether he should maintain the initial drill speed, increase it, or decrease it. As the load varies on the drill human feedback also tells the operator how to manipulate the trigger in order to maintain the desired constant speed (PX 1).

6. As of September 28, 1962, the date of the Gawron patent application, the scope and content of the prior art included the following:

(a) Gemmill patent (Gemmill) No. 2,609,-525, (PX 2A; Defendants' Exhibit, hereafter DX 32), which teaches that the speed of an electric appliance, such as a food mixer, can be varied by using a trigger in combination with a circuit which features a rheostat. The desired speed for the food mixer is obtained and maintained by human feedback (T 982–983).

(b) An SCR manual (SCR manual) published by the General Electric Company (DX 40), which teaches that since 1957, in hundreds of different jobs, the SCR has replaced certain components, including rheostats (*Id.*, p. ii).

(c) Slater patent (Slater) No. 3,103,618 (PX 2A; DX 35), which teaches that an SCR circuit can be used in a switch to vary the dimming of a lamp by utilizing a knob to set the desired level of dimming.

(d) Australia patent (Australia) No. 242,-179 (PX 2A), which teaches that an SCR circuit can be used in a portable electric drill to vary the drill speed by combining a knob, to set the desired speed, with a built-in speed regulating circuit, to maintain that speed.

(e) An article by F. W. Gutzwiller (Gutzwiller) titled "Universal Motor Speed Control", published by the General Electric Company (PX 2A; DX 37, 38), which teaches that SCR circuits can be used to obtain a range of motor speeds, and that if constant speed is desired with a varying load an SCR circuit with inherent feedback is required.

7. The difference between the prior art and the claims of the Gawron patent is as follows:

(a) Gemmill teaches the elements of speed control, human feedback (T 982–983), and use of a trigger; however, its circuitry features a rheostat rather than an SCR. Moreover, the Gemmill rheostat speed control circuit cannot be used in an electric hand drill (T 1047, 2419–2420, 2905–2907).

(b) Although Gutzwiller reveals the SCR circuit which is utilized by the Gawron patent (DX 37, pp. 2–3; T 978–980), it does not teach that the circuit can be utilized to achieve essentially constant speed characteristics with a varying load, nor does it teach the use of a trigger.

(c) Slater relates to a dimming switch rather than the speed of a hand driven motor, and does not mention varying load conditions. Moreover, Slater alters the voltage and current being applied by means of utilizing a knob to preset the desired level, rather than by utilizing human feedback with a trigger to reach the desired level during operation.

(d) Australia teaches an SCR circuit being utilized in a portable electric drill, but teaches use of automatic, or inherent, feedback rather than human feedback. Australia uses a knob to preset the desired speed and relies upon the inherent feedback circuit to maintain that speed; whereas Gawron does not present the desired speed, rather it uses a trigger to reach the desired speed and relies upon human feedback to maintain that speed during operation of the drill.

(e) The SCR manual does not refer to the elements of human feedback, use of a trigger to achieve speed control, nor even speed control.

8. It is possible to combine the Gemmill feedback device with the relevant Gutzwiller SCR circuit to create the claims of the Gawron patent (DX 32, 173; T 2185–2214). The factual issue is whether this combination of elements was within the level of ordinary skill in the art as of September 28, 1962. That level of skill was as follows.

(a) The Gemmill patent was issued in 1952 (DX 32, p. 1). SCRs were not introduced on the market until 1957 (DX 40). No suggestion has been made that Mr. Gemmill was skilled in the art of SCR circuitry.

(b) Mr. Gutzwiller did possess expertise in the art of SCR circuitry, as reflected in his 1961 prior art publication (DX 37, 38; PX 2A). An essential element of the inventive concept of the Gawron patent is set forth in the last full paragraph of the specification prior to setting forth the claims, which reads as follows (PX 1):

> As it is apparent to those skilled in the art, the circuit shown and described does not have inherent speed feedback. However, essentially constant speed under varying load conditions can be readily obtained by manipulation of the trigger which is under the operator's control at all times during operation of the tool.

This quoted paragraph of the Gawron patent is diametrically opposed to the teaching of Gutzwiller, which taught that to achieve essentially constant speed with the application of a varying load and SCR speed control circuit with inherent feedback was required (T 1001, 1050–1052). This interpretation of Gutzwiller is readily apparent from an analysis thereof:

(1) Gutzwiller describes four SCR circuits. One circuit, that which is utilized in the Gawron patent (T 978–980), does not have inherent, or automatic, feedback. The other three Gutzwiller circuits do have this feature. Gutzwiller distinguishes between the benefits of SCR circuits: (1) all four circuits " . . . can be used wherever a wide range of speed is required. . . ."; whereas (2) as to the three circuits with "inherent speed feedback", they are also capable of providing " . . . essentially constant speed characteristics adequate for many types of applications over a wide range of speed." (DX 37, p. 1).

(2) Gutzwiller's first SCR circuit, that without inherent speed feedback, is incorporated in the Gawron patent. With regard to this circuit, Gutzwiller notes (*Id..,* p. 3):

As it stands, this circuit is handicapped by the well-known drooping speed-torque characteristic of series motors. As load is increased, the motor slows down markedly, and if load is removed, the motor runs up to a high speed. To achieve essentially constant speed characteristics with varying load, some type of feedback is necessary for a series motor control. The following three circuits achieve feedback.

. . .

The three SCR circuits which solve this problem are those which contain inherent speed feedback.

(3) In comparing the four SCR circuits under the heading, "Speed Regulation & Stability Performance" Gutzwiller rates the first circuit, that without feedback, as "Poor (no feedback)". The other three circuits, those with inherent feedback, are rated as "limited", "good", or "best". (*Id.,* p. 8).

(4) It is evident from the above discussion that what separates the first circuit, that without inherent feedback, from the other circuits is the ability of the latter to "achieve essentially constant speed characteristics with varying load". Gutzwiller is clearly stating that only those circuits with inherent feedback are capable of achieving this feature. The Gawron patent requires constant drill speed under varying load, hence Gutzwiller teaches that inherent feedback SCR circuits are required in a Gawron patent device.

(5) Gutzwiller included the first circuit, that which does not have the inherent feedback necessary to achieve essentially constant speed characteristics with varying load, because his publication does not appear to be limited to uses which required constant speed capability. He lists nine categories of typical uses for the SCR circuits, including food mixers, hand tools, process machinery, movie projectors, machine tools, home appliances, conveyor systems, fans, and hobby and toy applications. (*Id.,* p. 1). With such a wide variety of suggested uses it would not be surprising that at least one of them only requires the capability of achieving a wide range of speed, without the additional capability of maintaining constant speed under the application of a varying load.

(c) No evidence was offered at trial to suggest that as of September 28, 1962 Gutzwiller did not reflect the level of ordinary skill in the art of SCR circuits. Accordingly, the ordinary skill in the art of SCR speed control circuits as of September 28, 1962, taught that to achieve essentially constant speed under the application of varying load an SCR speed control circuit with inherent feedback capability was required. No evidence was offered to show it was obvious to the appropriate mechanic of ordinary skill as of September 28, 1962, to combine Gemmill with Gutzwiller's first SCR circuit as a means of achieving constant speed under varying load.

9. On September 21, 1965, Mr. Gawron filed an application for a patent in Canada (DX 41, p. 1). During the course of the proceedings the agents for Mr. Gawron stated that claims 1 to 4 of the Canadian application were virtually identical with the claims of the United States Gawron patent (*Id.,* p. 18). The application was eventually rejected as being within the expected skill of one versed in the art. (*Id.,* pp. 75–79).

(a) No evidence was introduced showing that in 1965 Canadian patent law was substantially identical to United States patent

law, or that the facts and circumstances surrounding the Canadian application were substantially identical to those surrounding the Gawron application before the United States Patent Office.

10. Skil entered into licensing agreements concerning, among other patents, the Gawron patent. Thus Skil contracted with Arrow-Hart Inc., beginning in 1965 (PX 115), the Milwaukee Electric Tool Corp. in 1966 (PX 113), McGraw-Edison Company in 1966 (PX 114), Singer Company in 1967 (PX 117), Black & Decker Manufacturing Company in 1971 (PX 118), and defendant Millers Falls Company in 1975 (PX 116). Generally speaking, the royalty rates under these licensing agreements ranged between three and four percent. Skil has received in excess of one million dollars in royalties on the Gawron patent (PX 119E; T 700–701), and since 1964 it has sold approximately one hundred million dollars worth of products which embody the Gawron patent (PX 136, 137, 138; T 615–616).

11. Skil filed an action for infringement of the Gawron patent in the United States District Court for the Northern District of Illinois, and on June 28, 1968, the court ruled the Gawron patent invalid (PX 111; *Skil Corporation v. Cutler-Hammer, Inc.,* 159 U.S.P.Q. 423 (N.D.Ill.1968)). This ruling was appealed and on June 12, 1969, the Seventh Circuit Court of Appeals reversed, ruling that the Gawron patent was valid (PX 111; *Skil Corporation v. Cutler-Hammer, Inc.,* 412 F.2d 821 (7th Cir. 1969)).

### First Inventorship

12. Mr. Gawron began working for Skil in 1960 as an engineer in research and development (T 59). He filed his application for what later became the Gawron patent on September 28, 1962 (PX 2).

13. In the latter part of 1960 Mr. Matthews began investigating, on behalf of Lucerne, possible functions of the switch used to turn portable power tools on and off. (DX 155). By December 23, 1960, this investigation had evolved into a "speed control project" which was being worked on by Mr. Matthews and Mr. Jules F. Rhine (DX 156, T 2238–2239). Their efforts eventually

produced, independent of the efforts of Mr. Gawron, the invention set forth in the Gawron patent. A critical issue is the date on which they reduced their speed control device (the Lucerne speed control device) to practice.

14. Both Mr. Rhine and Mr. Matthews testified they first successfully operated a drill with the Lucerne speed control device during the week between Christmas of 1960 and New Years Day of 1961. Mr. Rhine testified they "stuffed" the device into a Ram drill, which "did operate" (T 2261), and that upon pulling the drill trigger they "did achieve control" and "did vary the speed of the drill" (T 2315–2316). Mr. Matthews testified that as the trigger was pulled the drill "would start slowly and get faster and faster and faster". He noted the device varied the motor's speed "Continuously." (T 2543).

(a) This testimony comprises the entire description of the 1960 testing of the speed control device. None of the details or surrounding circumstances were described.

(b) An electric hand drill with a speed control device must be capable of drilling into wood, plastic metal and other materials. It must also be able to withstand rough treatment. (T 3472–3473). The Lucerne testing did not indicate any drilling into appropriate material.

(c) The Lucerne testing did not indicate that a varying load was applied to the drill as it was being operated.

15. Despite viewing the 1960 test as "a landmark", which represented something they "had been trying to do for many years", not one piece of paper was introduced which referred to that test. Mr. Matthews' explanation for this failure was that ". . . we don't keep records like that." (T 2625).

16. Mr. Rhine and Mr. Matthews testified they demonstrated the Lucerne speed control device to three other individuals (T 2436, 2544).

(a) Not one of these individuals was called to corroborate or describe the alleged demonstration, although it appears their

testimony would have been relevant (DX 9, pp. 27, 45, 52).

(b) There is no evidence that any of these individuals were peculiarly within the control or power of the defendants to produce them at trial.

17. The only relevant Lucerne document which arguably shows the Lucerne speed control device circuitry was drawn by Mr. Matthews and dated July 6, 1961 (DX 158). This crude drawing admittedly was in error since it would cause a short circuit as drawn (T 2550–2551).

18. The first Lucerne speed control device, that which allegedly operated the Ram drill in 1960, was subsequently altered, thus the original is no longer in existence (T 2236, 2247, 2545–2546, 2872–2874). In its altered form it was introduced into evidence (DX 16). The device as altered was not demonstrated at trial to be operable.

(a) Mr. Rhine and Mr. Matthews did not agree as to the period of time during which alterations were made to the original device, Mr. Matthews stating they occurred from 1960 to some time in 1962 (T 2874), Mr. Rhine testifying they were made from 1960 to the fall of 1963 (T 2247).

(b) A tag attached to the altered Lucerne speed control device reads in part, "November 1960" (DX 16). Mr. Matthews testified he wrote this tag and attached it to the original device in November of 1960. Upon further examination he testified that since the first device was constructed in December of 1960 he put the tag on at that time, but wrote "November 1960" since that represented when he had received the SCR for the device (T 2618–2620). He indicated confusion as to the precise month and year that he obtained certain components of the device, and conceded that picking out the month was "a little difficult." (T 2822–2829). This tag has followed along with the speed control device during all its later modifications. Mr. Matthews acknowledged it was possible, but not probable, that the tag could have got "fouled up" at some time (T 2620–2625).

(c) A photograph taken prior to August 3, 1966, of the first model of the Lucerne speed control device does not show the tag which is now attached to it (DX 9, pp. 61, 64, 66; T 2913–2916).

19. Mr. Rhine testified that he worked on a second model or prototype of the Lucerne speed control device during the 1961 through 1963 time period (DX 17; T 2267–2269). He did not know whether the original parts remained on the device (T 2271). Mr. Matthews testified that ". . . we made it [DX 17] and it worked, and it was put away." He further testified that no changes were made in its components (T 2632–2633). No other evidence of testing was offered concerning this model.

(a) Attached to the second model of the Lucerne speed control device is a tag which reads in part "Feb. 1962" (DX 17). Mr. Matthews testified he wrote this on the tag at about the time it was made (T 2614). Mr. Rhine could not identify this tag (T 2274).

(b) A photograph of the second model does not show the tag which is now attached to it (DX 9, pp. 61, 64, 66; T 2913–2916).

(c) One of the components of the second model is an SCR with the legend on it "GE C15B 252" (DX 17). Although Mr. Matthews testified that it was the original component of the second model, assembled some time in February of 1962, there is other evidence that the legend shows the SCR could not have been manufactured before the last week of December, 1962 (Plaintiff's Rebuttal Exhibit, hereafter PXR, 50, pp. 14–15, 18–19, 33–34; PXR 52).

20. Three additional physical devices (DX 19, 20, 21) were introduced to show various stages of development of the Lucerne speed control device. The tags attached to these devices indicate they were developed subsequent to 1962. (*See also* T 2285, 2291–2292, 2298).

21. There is no clear and convincing evidence that the Lucerne speed control device was tested prior to September 28, 1962, in such a way as to demonstrate its practical utility for its intended purpose.

22. Assuming Lucerne achieved a reduction to practice in December of 1960, it did not disclose its speed control device to the trade until approximately 36 months thereafter, in late 1963 or early 1964. During this 36 month period Lucerne was seeking to achieve a retrofit package for its speed control device which would sell for no more than $3.00. A retrofit package is described as housing the speed control components inside a casing which can be directly placed in the location previously utilized by the normal on/off trigger switch in a hand held electric drill. (T 1591–1592, 1625, 2262–2263, 2284–2285, 2562–2563, 2913, 2943–2944).

23. Lucerne did not file a patent application concerning either its speed control components or its retrofit package until it was prompted to do so upon learning in early 1964 that Skil had a patent application on file (T 2911).

(a) The Lucerne patent application of March 26, 1964, contained eight claims, none of which were referred to placing the speed control circuitry into the handle of an electric drill or of achieving a retrofit package. (DX 9, pp. 12–14). The Lucerne patent application specification did note that, "Although not herein disclosed . . . [certain] components of the instant embodiment of control circuit may be constructed of such size as to enable the same to be 'miniaturized' . . . so as to enable the complete circuit to be placed within the housing of the motor as, for example, in the handle of the portion of a portable type of power drill or saw." (Id., pp. 10–11).

### The Conduct of Skil

24. Mr. Gawron began work on his invention in 1962, and in the summer thereof he constructed a prototype speed control circuit which he placed into a drill. He later filed his patent application on September 28, 1962 (T 72, 76–77; PX 4).

25. Mr. Gawron continued work on his invention after filing his application, in part seeking an economically feasible method to place his SCR speed control invention into an electric hand drill. During this period Mr. Matthews and Mr. Rhine were independently seeking to reach the same goal.

26. On December 3, 1963, the patent examiner rejected all five claims of the Gawron patent application. (PX 2, p. 13).

27. Mr. Matthews and Mr. Rhine were eventually able to achieve a retrofit package for the Lucerne speed control device, and in January of 1964 Lucerne began to demonstrate it to various companies, including Skil in Chicago, Illinois. (T 2572–2573).

28. Lucerne left a sample of its speed control device with Skil. Mr. Gawron subjected it to a series of tests, and submitted a report on his testing (DX 67).

(a) Some differences between the Lucerne device and the design of a Skil speed control device were noted, but there were also many similarities. In comparing the two controls Mr. Gawron stated in part (Id., pp. 3–4):

> Reason for SKIL controlled design-exclusive design. By keeping design in our own Engineering Department, we can move faster and keep competition in the dark about the approach we are taking. By keeping the design here we would not be helping Lucerne in the further development of this control. Lucerne has not demonstrated any special 'know how' or engineering talent that we do not possess here. By keeping design here we can gain more knowledge on these controls which should be useful in future products. Reasons against SKIL control design—Would consume additional Engineering man-hours. SKIL would have to assume tooling cost.

Mr. Gawron recommended that Skil evaluate the necessary tooling cost for a new trigger control design and estimate the additional time to design same.

(b) The Lucerne speed control was the only device known to Mr. Gawron in February of 1964 that was completely encased in a housing which could be mounted in the handle of a drill. His prototype (PX 4), which was the only physical embodiment of his invention that he had constructed, did not have the speed control elements exclusively housed in the handle of the tool. A

subsequent design also was not housed exclusively in the tool handle. (T 962–964, 996–997). Mr. Gawron was aware in February of 1964 that the Lucerne speed control device he tested embodied the subject matter of his patent. (T 451).

29. The Lucerne speed control device also prompted two memoranda in February of 1964 from Mr. Frank Kaman, who either was, or was about to become, a vice-president of Skil. The memoranda were dated February 6 and February 20 of 1964. The first memo was directed to eight Skil employees, including its president, assistant to the president, chairman of the board, and general counsel. (DX 1, 2; T 1177–1178). Mr. Kaman described the desirability of an innovative trigger type speed control, and Skil's efforts to achieve this goal. The retrofit package of the Lucerne device was an attractive feature which Skil did not have. His major concern was directed toward the potential competitive threat of the Lucerne speed control device to Skil's goal of achieving a unique position or innovation in the field of trigger speed control. He proposed various methods, either singularly or in combination, and sometimes in rather blunt language, to maintain an exclusive position for Skil:

(a) Skil could proceed independently of Lucerne with its own development. He recommended this approach be rejected since the Lucerne device was the most feasible method for Skil to put the Gawron invention into production (DX 1, 2).

(b) Skil could join forces with Lucerne. This approach was recommended after considerable study of the alternatives (DX 2).

(c) Mr. Kaman felt that "there is a chance" the Gawron patent date "may precede" the Lucerne activities, thus Skil "may prevail over Lucerne on this basis alone." (DX 1). He felt that the Gawron patent "affords some encouragement as to the novelty" of Skil's efforts, but Skil did "not have positive assurance as to the breadth of coverage" afforded by that patent. Nonetheless there was "no reason to downgrade the originality of" Skil's patent efforts. Skil could inform Lucerne of its patent position and warn there would be legal consequences if Lucerne did not join forces with Skil. (DX 2).

(d) Skil could offer to give Lucerne business in other areas as inducement to obtain exclusive production rights from Lucerne (DX 2).

(e) Skil could inform Lucerne of the fact certain improvements were required before its device could be placed into production (DX 1, 2).

(f) Skil could order a sufficient number of Lucerne's speed control device units to saturate its production (DX 1, 2).

(g) Skil could acquire the Lucerne corporation, but such an acquisition was not desirable for the sole purpose of acquiring exclusive possession of the Lucerne speed control (DX 1, 2).

30. Skil personnel, including Mr. Kaman, had numerous communications with Lucerne personnel, concerning the Lucerne design, including a trip to the Lucerne plant in Ohio. (T 2573–2577).

31. Skil and Lucerne entered into negotiations, and on March 2, 1964, Skil ordered 100,000 of the Lucerne speed control switches at $3.00 apiece. (DX 3, T 2578–2579).

(a) At the time of the purchase order Lucerne did not have production facilities to manufacture its speed control device. Skil assisted Lucerne in the large undertaking of creating the necessary production facilities, in part by supplying two tool and dye makers for a period of approximately three weeks at the Lucerne production plant (T 2408–2411, 2582–2585).

(b) Skil insisted on a zero start capability in the speed control and made other suggestions. (T 1637–1638, 2410, 2591–2593, 2605–2606).

32. On March 3, 1964, Skil amended its initial application by canceling original claims 1, 2 and 5 and adding new claims 6 and 7 (PX 2, pp. 15–19). In the supporting remarks Skil noted in part that Mr. Gawron's electrical control system ". . . is small and compact and readily lends itself

to mounting within the handle of the tool without causing heating of the handle." It also noted that Mr. Gawron's invention for the first time provided an extremely compact trigger operating control system ". . . which may be readily mounted in the housing of a power tool, such as the handle of an electric drill, for example." (*Id.*, p. 18).

(a) There is no evidence that either Mr. Gawron or Skil informed the Patent Office of the Lucerne speed control device.

(b) The prototype drill of Mr. Gawron did not locate the SCR speed control circuitry in the drill handle (T 964–965), and three of the five originally filed patent claims did not limit the circuitry to the drill handle. Original claim three, however, did refer in part to ". . . said motor and devices connected in series therewith being mounted on a handle, and a trigger on said handle connected to . . ." (PX 2, 7). The originally filed specification stated in part that the invention related generally to electric motor control systems and had "particular relation to . . . a universal motor driven hand drill . . ." (*Id.*, p. 1). It further noted that ". . . the control devices associated with the silicon controlled rectifier [SCR] 15 and the silicon controlled rectifier [SCR] 15 itself can be mounted in a handle or other convenient portion of the tool . . ." (*Id.*, p. 4). The diagram accompanying the original application showed the speed control circuitry as being mounted in the handle of a tool. (*Id.*, p. 12).

(c) The Gawron invention does not include instructions or specifications as to how a physical assembly of the SCR speed control can be constructed (T 996–997). Rather, the invention sets forth a combination of elements necessary to accomplish speed control and the location or packaging of the SCR circuitry is not an element of that combination.

33. Production facilities at Lucerne were sufficiently completed to permit manufacturing of the Lucerne speed control device, designated Model TSC 113 or 114, in the spring of 1964 (T 1295, 1595–1596). After the original purchase order was filled, by May of 1965, Skil issued additional purchase orders to Lucerne for its TSC 113/114 model (T 1341), including a second order for another 100,000 switches at $2.35 apiece. (T 2607).

34. On November 24, 1964, the patent examiner rejected the remaining claims of Mr. Gawron's patent application. (PX 2, pp. 20–21).

35. Attorneys for Skil and Lucerne began negotiations with reference to a potential agreement concerning the exchange of information proving priority of invention dates. (DX 12, 14).

36. Negotiations culminated in an agreement dated March 9, 1965, between Skil and Lucerne, which included the following (PX 98):

(a) The agreement was entered into by reason of the pending patent applications of Skil and Lucerne, which applications ". . . may have claims to common subject matter or may support claims to common subject matter, . . .", and the parties' desire to avoid a Patent Office interference and "decide between themselves as to which party is entitled to any patent. . . ."

(b) The attorneys would make a mutual disclosure of the respective patent applications, determine whether there was common subject matter, and, if so, compare proofs as to date of inventorship.

(c) In the event they could not agree as to which party was entitled to the claim or claims as to common subject matter the Patent Office would be requested to set up an interference to determine same.

(d) In the event a patent was issued to either Skil or Lucerne the party owning the patent would grant to the other party a nonexclusive license to make the speed control switch units for a royalty of three percent, or lower in the event another license was granted for a lower royalty. It was the duty of the licensor to sue infringers of whatever patent may be obtained.

37. At the March 9, 1965, signing of the agreement the parties disclosed their respective patent applications to each other (T 2949).

38. Ten days after the license agreement was entered into, on March 16, 1965, Mr. Kaman and an attorney for Skil met with the patent examiner concerning the Gawron patent application. They demonstrated the Gawron invention by operating a variable speed control drill which incorporated the invention. The invention was embodied in a Lucerne speed control device which Skil had purchased from Lucerne. (T 1321-1328).

39. Six days after meeting with the patent examiner, on March 25, 1965, another amendment to the Gawron application was filed (PX 2, pp. 22-24).

(a) In the remarks accompanying the amendment the March 16, 1965, meeting was acknowledged and briefly described (*Id.*, pp. 24-26). There is no evidence showing that (1) the patent examiner was informed that the demonstration drill contained a Lucerne speed control device, or that (2) Skil pointed out to the examiner the retrofit feature of the Lucerne device or otherwise contended that the invention included the retrofit feature as an element.

(b) The remarks also contained argument seeking to distinguish the Gawron claims, as amended, from certain prior art patents, which included the Gemmill patent. The patent examiner was shown a copy of these patents, and with reference thereto it was noted that, "None of these patents in any way relate to a trigger speed control using a silicon control rectifier circuit, and in particular the type of circuit which permits the operator of the tool to achieve feedback by finger control." (*Id.*, p. 26).

40. Two weeks later, on April 6, 1965, the patent examiner reconsidered the Gawron application and allowed it. (*Id.*, p. 30).

41. On May 20, 1965, Mr. Gawron executed a supplemental oath, stating in part that ". . . he does not know and does not believe that the same [Gawron invention] was ever known or used before his invention thereof. . . ." (*Id.*, p. 32).

42. On June 15, 1965, the Patent Office received a requested amendment of the Matthews, et al., application which added claims 9 through 12. In the accompanying remarks it was noted that the new claims were being entered into the record inasmuch as the applicant had been advised they had just been allowed in another pending application directed to the identical subject matter. The applicant understood the other application was that of Mr. Gawron. (DX 9, pp. 19-23).

43. On June 30, 1965, attorneys for Skil and Lucerne met in Chicago. Lucerne exhibited its first two trigger speed control device prototypes (DX 16, 17). Counsel for Lucerne represented that the two prototypes were made by Mr. Matthews and others before the relevant Gawron invention dates, but no supporting documentation was shown by Lucerne at this meeting. (T 2949-2954).

44. Approximately one week later, on July 7, 1965, Skil paid the final fee for the Gawron application to the Patent Office (PX 2, p. 36).

45. One week later, by letter dated July 13, 1965, counsel for Skil informed counsel for Lucerne that Skil had received official notice from the Patent Office of allowance of the Gawron application. The letter noted that, "Since we have heard nothing from you concerning establishing the reduction to practice dates associated with the switch unit shown to us during your visit of June 30, 1965, we assume these dates cannot be supported by clear and convincing evidence as required." The letter continued that Skil paid the final fee to avoid any delay in issuance of the patent, since, "As you and your client will appreciate, a delay in granting of this patent could place both Skil and Lucerne at a disadvantage." The letter concluded that if Lucerne subsequently developed adequate proof concerning the Lucerne invention dates, ". . . appropriate steps can of course be taken so that the patent will be awarded to the proper party." (DX 22).

46. Lucerne did not object to Skil's payment of the fee. In a letter dated July 20, 1965, counsel for Lucerne confirmed receipt of the July 13 Skil letter, and noted in part that Mr. Matthews ". . . has not as yet completed his investigation of files in an effort to find proof of his invention relating to the speed control device which I disclosed to you during my visit of June 30 to the Skil headquarters." Counsel expected that Mr. Matthews would conclude his investigation within a very short time (DX 23).

47. On September 28, 1965, the Gawron patent (PX 1) issued out of the Gawron application (PX 2).

(a) The Gawron application does not mention the June 30, 1965, meeting between the parties.

48. From the very beginning of their contacts, Skil expressed an interest in acquiring Lucerne (T 2608). There was a meeting in the spring of 1966 between, among others, Mr. John W. Sullivan, then President of Skil, and Mr. Matthews. (T 3268–3268A). This meeting was followed by formal offers of purchase from Skil, dated March 30, 1966, and April 6, 1966 (PX 165, 166). Although Mr. Sullivan was of the opinion that a purchase agreement was imminent (PXR 48), the acquisition was never consummated (T 3299). Mr. Sullivan did not threaten to litigate Lucerne to death if there was no agreed upon sale (T 3299–3300, 3327).

49. On November 15, 1965, Skil and Lucerne amended their earlier license agreement, by entering into an addendum which in part took note of the Gawron patent, and stated that if Lucerne obtained a patent it would be assigned to Skil with Lucerne receiving a nonexclusive, royalty-free license. (PX 99).

50. On May 19, 1966, the patent examiner rejected all claims of the Lucerne application (DX 9, pp. 33–35).

51. On August 4, 1966, an amendment was filed to the Lucerne application. As to claims 9 through 12 Lucerne requested that an interference be declared between its application and the Gawron patent (*Id.*, pp. 36–44).

52. In response to the amendment of August 4, 1966, the patent examiner rejected all Lucerne claims on September 9, 1966 (*Id.*, pp. 95–97), and sometime thereafter the application was abandoned (*Id.*, p. 98).

53. After the Gawron patent was issued on September 28, 1965, during the period between early 1966 and August of 1967, Lucerne, for the first time, showed a document (DX 158) to Skil in an effort to establish priority of invention. Two additional documents (DX 156, 157) were first disclosed to Skil in August of 1967. (T 2948–2954).

54. There is no clear and convincing evidence that Skil intentionally withheld from, or misrepresented to, the Patent Office any pertinent or material information concerning the Gawron application.

55. There is no clear and convincing evidence that any of Skil's conduct before the Patent Office was taken with the intent to deceive.

56. Skil has had a national account with the J. C. Penney Company (J. C. Penney) for the sale of a varying range (from ten to forty) of Skil power tools since at least 1970 (T 1958–1959; DX 120A).

(a) The general procedure was for Skil to enter into a contract with J. C. Penney once or twice a year, each contract specifying a price for each separate Skil product being sold during the contract period. Skil's overall objective in each contract was to obtain a profit. Certain tools in the mix were sold at a loss, but these losses were compensated for by the profit made on other tools in the mix. (T 2762–2765; DX 122, pp. 24–25).

57. During the period 1971 through 1977 Skil sold products, including drills, to J. C. Penney incorporating the Gawron invention. Some of these drills were sold below cost, while others were sold at a profit. During the same period Skil sold products, including drills, which did not incorporate the Gawron invention. Some of these drills were sold below cost, while others were sold at a profit. (T 2002–2004, 2060–2062, 2755–

2758, 2760–2767; DX 120A, 142). An example from each of these categories shows the following during the August 3, 1971 contract (DX 120A):

(a) A drill containing the Gawron invention, designated as Part 457–49:4, was sold for a 30.8% profit.

(b) A drill containing the Gawron invention, designated as Part 501–49:3, was sold at a loss of 14.7%.

(c) A drill which did not incorporate the Gawron invention, designated as Part 541–49:5, was sold for a profit of 35.5%.

(d) A drill which did not incorporate the Gawron invention, designated as Part 503–49:8, was sold at a loss of 34.1%.

58. There is no evidence that Skil conditioned the sale to J. C. Penney of one product upon the sale of another product, or that Skil conditioned the sale of a product with the Gawron invention upon the sale of any other product. There is no evidence that those Skil products containing the Gawron invention which were sold below cost were sold in that manner because they contained the invention. There is no evidence that during any contract period the total loss from sales of products containing the Gawron invention exceeded the total profit made from other products containing the Gawron invention.

59. Wen, one of the defendants herein, manufactures a line of electric portable tools, including drills (DX 121, p. 7). Wen has sold power tools to J. C. Penney since the early 1960's (*Id.*, p. 11). Over a certain period of time J. C. Penney discontinued purchasing various items from Wen. While it appears that some of the Wen items were discontinued in favor of Skil items (*Id.*, pp. 49–52), there is no evidence that those particular items included the Gawron patent invention, or that those particular items were being sold by Skil below cost to J. C. Penney. Since 1972 Wen's business with J. C. Penney has expanded rather substantially, to the point where it has become a "very good" account (DX 122, p. 21).

Devices Covered by the Gawron Patent

60. Lucerne has manufactured essentially two different speed control devices: (1) the TSC 113 and 114 models; and (2) the TSC 252, 254, and 256 models. The first type was manufactured and sold between 1964 and 1968. The second type (hereafter referred to as the TSC 254 model) was manufactured and sold from late 1968 to the present time. (PX 44, at Interrogatory 35; PX 130, at Interrogatory 2; Stip., paras. 23, 25).

61. The first speed control device, in models TSC 113 and 114, comes under the terms of the Gawron patent (PX 40, pp. 37, 40; PX 44, at Interrogatory 35, 36; PX 101, 102). The remaining issue is whether the TSC 254 model comes under the Gawron patent.

62. The Gawron invention permits the operator of a tool which is being run on alternating electric current to vary and control the voltage and current being applied to the tool motor, and thus its speed, by using human feedback to manipulate the trigger of the tool. Manipulation of the trigger alone does not achieve speed control. Rather, the trigger and motor must be connected to an SCR speed control circuit. Such a circuit functions as follows (PX 20A, 20B; T 218–246):

(a) Absent an SCR speed control circuit the voltage appears at the motor in alternating waves of positive, then negative, polarity. A positive voltage wave begins at zero, increases to its peak voltage, then decreases back to zero. The voltage then reverses its polarity, from positive to negative, and the negative voltage wave then appears at the motor in form and manner essentially the mirror image of the positive wave. One cycle is defined as a positive wave followed by a negative wave. In the United States sixty of these cycles commonly occur each second. The electric current flows through the circuit in two directions, changing its direction with each change in voltage polarity, hence the term "alternating current." Although the voltage changes its polarity, and the current changes its direction, during each cycle, the

motor does not recognize these changes and runs in a single direction at the maximum speed permitted by the voltage.

(b) Inserting an SCR in the alternating current circuit has the effect of blocking the flow of current in one of its two directions. As a result the motor receives current for one-half of each cycle, and coasts during the other half cycle. The half cycle of current which the motor receives is always flowing in the same direction. The other current direction is always blocked by the SCR.

(c) If only an SCR is placed in the circuit there will not be speed control. The motor will be run by current flowing to it at a constant rate equal to one-half of every cycle. It is necessary to add a timing circuit to the SCR, which enables the operator to alter the amount of voltage and current being applied to the motor, and thus alter the motor speed. The timing circuit is controlled by manipulating the tool trigger. By way of example, the operator may manipulate the trigger to set the timing circuit in such a way that voltage causes current flow to the motor during one-eighth of the cycle rather than the one-half cycle permitted by the SCR alone. By moving the trigger the operator may alter the timing circuit in such a manner to permit current flow to the motor during one-fourth of each cycle, thereby increasing the motor speed. The combination of an SCR with a timing circuit is the SCR speed control circuit.

63. The amount of current being applied to the motor at any give time is sometimes described in terms of bursts, or pulses, or voltage. The motor is energized, or caused to operate, by each pulse of voltage, then coasts between pulses. Because the pulses are being applied at a rapid rate the coasting is indistinguishable from the pulses. The SCR speed control circuit varies the duration of the pulses, hence the amount of voltage being applied to the motor, and thus the motor speed.

64. The timing circuit of the SCR speed control circuit in the Lucerne TSC 254 is in parallel relationship with the motor (DX 149; T 492–506, 1383–1386, 1560); whereas, the timing circuit of the SCR speed control circuit described in the Gawron patent is in series relationship with the motor (T 491–492, 1382–1383, 1559–1560). The parallel relationship found in the Lucerne circuit is not covered by the claim language of the Gawron patent, which is limited to a series relationship (PX 1).

65. Comparison between the SCR speed control circuits of the Gawron patent and the Lucerne device (PX 20) reveals the following:

(a) In a parallel relationship when the SCR is turned off, i. e., when it is blocking current to the motor, there is no line voltage into the motor; whereas in a series relationship voltage is applied to the motor even when the SCR is turned off. The result is that voltage transients (termed "hash") caused by the motor are sometimes generated in the Gawron circuit when the SCR is off, whereas, hash is not generated in the Lucerne circuit when the SCR is off. (DX 171; T 2133–2161).

(1) The hash cannot be discerned by the operator of the drill, but it is sometimes, discernable by means of an oscilloscope. There is no evidence that this hash has a demonstrable effect upon the circuit operation or its components (T 2162–2163, 2332–2343, 2394–2403).

(b) In both the parallel and series relationships when the SCR is turned on, i. e., when it is supplying current to the motor, the current flows to, and through, the motor in the same manner (PX 20; T 1382–1392).

(c) The voltage wave forms, as depicted on an oscilloscope, which are generated by the Gawron circuit are substantially identical to those generated by the Lucerne circuit. (PX 160; DX 163; T 1547–1555).

(d) The SCR itself, as distinguished from the timing circuit of the SCR speed control circuit, is in a series circuit relationship with the motor in both the Gawron patent and Lucerne device. (T 586, 1557, 1560–1561).

(e) The various components which comprise the SCR speed control circuit of the

Gawron patent are essentially the same as the components in the Lucerne TSC 254 SCR speed control circuit (T 1560–1562).

(f) Whether the timing circuit is in series or parallel relationship with the motor, the results of the Gawron and Lucerne circuits are the same in that they both control motor speed (T 1562).

(g) It is the load voltage running to the motor which controls the motor speed. The most significant result of any SCR speed control circuit is how it controls this load voltage. In both the Gawron and Lucerne circuits load voltage is controlled in essentially the same fashion (T 1540, 1560, 1562–1563).

(h) Human feedback is utilized in the same manner in both speed control circuits.

66. The Lucerne TSC 254 speed control device is equivalent to a device covered by the express language of the Gawron patent since it does the same work in substantially the same way and accomplishes the same result.

Cancellation of the License Agreement

67. As noted earlier, Skil and Lucerne entered into a nonexclusive license agreement concerning the Gawron patent on March 9, 1965, and entered into an addendum thereto on November 15, 1965 (PX 98, 99).

(a) These two agreements, hereafter referred to collectively as the license agreement, did not provide a duration of time during which the contract would remain in effect.

(b) The license agreement did not set forth any conditions under which it could be cancelled, with the exception of granting the licensee a right to cancel if the licensor failed to bring suit to stop infringement of its patent by unlicensed third parties (PX 98, para. 3).

68. The license agreement (*Id.*) obligated Skil to institute litigation against infringers of the Gawron patent, which Skil did initiate, beginning in 1965. With the exception of one case the litigation was settled and resulted in several licensing agreements during the 1965 to 1967 period (T 703; PX 114, 115, 117 and 122).

69. Under the license agreement Lucerne was obligated to account and pay royalties to Skil for units manufactured in each calendar quarter within thirty days thereafter (PX 99); however Lucerne failed to commence paying royalties.

(a) On May 17, 1967, Mr. Matthews informed Skil that Lucerne would continue working under the license agreement, and that Lucerne's accounting department was completing its audit to determine the royalty payments due, at which time Lucerne would arrange for a transmittal of same (PX 100).

(b) On August 25, 1967, Mr. Matthews sent a check in the amount of $1,000, with a letter which indicated it covered ". . . partial payment of the amount we owe you in royalties under the Gawron patent. . ." In the same letter Mr. Matthews noted that Lucerne's auditor had just returned from a long trip to Europe which, with other matters, left items undone. The auditor was ". . . now catching up and a complete report will be forwarded to you in the near future." (PX 101.)

(c) Mr. Matthews sent another letter on November 2, 1967, which noted that the auditor has ". . . finally arrived at the number of TSC switches sold to firms other than Skil." The number of switches sold was 356,552, resulting in royalties due of $24,000, deducting the $1,000 already paid. Mr. Matthews concluded, "Now that we know the amount, we can arrange for method of payment." (PX 102.)

(d) The royalties remained unpaid, except for the single payment of $1,000. Lucerne's attorney wrote Skil's attorney on May 2, 1968, suggesting a method of payment involving a 5% rebate arrangement. The attorney also noted that he understood an "up-to-date accounting" was being completed and would be shortly available. (PX 103.)

(e) No royalties, except for the $1,000, have been paid.

70. As noted earlier, during the period between 1964 to late 1968 Lucerne manu-

factured one type of trigger speed control device. Since late 1968 to date Lucerne manufactured a new type of speed control device, the TSC 254 (*see* Finding of Fact 60).

(a) In February of 1968 Lucerne's counsel informed Skil's counsel by letter that Lucerne did not consider its new TSC 254 speed control (which had its timing circuit in parallel relationship with the motor) to infringe the Gawron patent, thus Lucerne claimed it was not obligated to pay royalties thereon under the 1965 license agreement. (DX 83.) This claim was made in good faith, and presented an honest argument in view of the patent language which limited the timing circuit to a series relationship with the motor.

71. Following the continuing failure of Lucerne to pay royalties on its speed control switches Skil instituted an action in the United States District Court for the Northern District of Illinois in July of 1968 seeking, among other relief, an accounting for royalties due under the Skil-Lucerne license agreement, and a ruling that the new Lucerne TSC 254 model switch was covered by the Gawron license. This action was subsequently transferred to this court and is the C69–461 lawsuit currently being tried.

72. In this action, on June 13, 1969, Judge Will of the Northern District of Illinois granted partial summary judgment to Skil on Count I, ordering Lucerne to account for all switch devices sold ". . . under the Gawron license. . ." (the license agreement of PX 98 and 99). Judge Will did not order summary judgment as to Count II, which sought a ruling that the Lucerne TSC 254 switch was within the scope of the Gawron license. (PX 126).

(a) Following the decision of *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), in an order filed September 24, 1970, Judge Will vacated the summary judgment and permitted Lucerne to assert the defense of patent invalidity. (PX 127, pp. 1, 10).

(b) Despite alleging patent invalidity Lucerne has maintained to this day that the 1965 Skil-Lucerne license agreement was not cancelled, rather it has remained in full force and effect (*see, e. g.,* Amended First Counterclaim of Lucerne, paras. 28, 31).

73. The various licensing agreements entered into by other companies and Skil between 1965 and 1967 (as a result of the Skil lawsuits) called for no royalty payments to Skil in the event the licensees were purchasing speed control devices from a licensed source. In 1970 Lucerne continued to fail to pay royalties. Skil heard that Lucerne was holding itself out as a licensed source, which was causing Skil problems with some of its other licensees. Skil felt it was placed in such an untenable position that it decided to cancel the Skil-Lucerne license agreement. (T 708–710, 713, 1860–1861, 1873–1874, 1905–1907, 1917–1919). As a result Skil informed Lucerne by letter, received on November 16, 1970, that Skil was cancelling the agreement. The reason given for cancellation was that although Lucerne owed royalties it had ". . . willfully refused to pay any payments to Skil under the license, other than the $1,000 payment, and have therefore breached the license agreement. Accordingly, Skil now elects to cancel the license and henceforth to treat your company as an infringer of the Gawron patent." (PX 109; Stip., para. 20).

(a) The Skil cancellation letter did not mention any other reason for cancelling. There was no clause in the license agreement permitting cancellation for nonpayment of royalties (PX 98, 99).

(b) There is no evidence that by holding itself out as a licensed source Lucerne acted in any manner contrary to the allegations in Skil's 1968 lawsuit that the parties had a license agreement, that royalties were due on it, and that Lucerne claimed the TSC 254 was not covered by the license. Specifically, there is no credible evidence that Lucerne represented to others that its TSC 254 was covered by the license.

(c) At the time it declared the license agreement with Lucerne cancelled, letters were sent to a number of licensees inform-

ing them of the cancellation and of Skil's intention to continue its litigation against Lucerne for past royalties due on speed control devices, including the Model TSC 254 (DX 160a–160g). A similar letter was written to another licensee in October of 1971 (DX 159).

74. After cancelling the license agreement in November of 1970 Skil filed its suit for infringement of the Gawron patent on November 13, 1972, in the Northern District of Illinois. That case has since been transferred and is Case C74–121 in the Northern District of Ohio, which case was consolidated and is being tried with C69–461. (See original complaint in C74–121, Civil Action 72C 2854, in the Northern District of Illinois).

### Defendants' Sales Activities

75. The license agreement gave Lucerne a nonexclusive license ". . . to make, have made, use or sell motor speed control switch units. . . ." covered by the Gawron patent (PX 98).

76. Mr. Matthews signed the Skil-Lucerne license agreement as the president of Lucerne (PX 98, 99), a position he had held since 1946 (T 2480–2481). He has also been the sole shareholder of Lucerne since 1970, and before then he and another owned all the stock (T 2857–2858).

77. In the infringement action those defendants other than Lucerne and Mr. Matthews were indemnified by Lucerne since they purchased their accused devices from Lucerne. (PX 76, 78). The damages sought by Skil from these other defendants relate to the Lucerne speed control devices (PX 146, 148, 149, 155).

78. Relevant sales of Lucerne devices which came within the Gawron patent totaled three million five hundred ninety thousand seven hundred fifty-seven dollars ($3,590,757.00) as of November 16, 1970. Subsequent to that date there was an additional three million three hundred eighty-three thousand one hundred eighty-four dollars ($3,383,184.00) in relevant sales of Lucerne switches. (PX 155; Stip. para. 43A).

(a) Thus total relevant sales of Lucerne switches since September 28, 1965 was six million nine hundred seventy-three thousand nine hundred forty-one dollars ($6,973,941.00). The three percent royalty called for in the license agreement totals two hundred nine thousand two hundred sixteen dollars ($209,216.00). Adding simple six percent interest to the royalties from the date each royalty payment was due gives a total of two hundred ninety-two thousand four hundred ninety dollars ($292,490.00) in royalties and interest. (PX 155).

### THE FRENZEL PATENT
#### Nonobviousness

79. The claims of the Frenzel patent at issue are claims 5, 7, 9 and 10. Each claim relates to a means for reversing the direction of rotation of the motor in an electrically powered portable tool which is operated by a trigger. As applied to a hand held electric drill, the result is to change the rotation of the drill from clockwise to counter-clockwise, or visa versa. The reversing mechanism includes an operating lever which has two positions. Movement of the lever from one position to the other causes the direction of rotation to be reversed. The patent specification notes that the "primary object" of Frenzel is to provide a reversing mechanism which includes an operating lever with ". . . a portion thereof uniquely arranged in relation to the tool trigger so that a person's finger operating the trigger may at the same time engage the operating lever for ready operation thereof." (PX 24). Implicit in this language, as well as from expert testimony (T 1026–1028, 1059–1060), is that this relationship between the tool trigger and the operating lever is applicable to when the operator is gripping the drill handle and operating the drill in normal fashion. As so applied, the "at the same time" relationship between trigger, operating lever, and trigger finger is reflected by the following language in claims 5, 7, 9 and 10 (PX 24):

(a) Claim 5 refers to a "reversing member" which ". . . has a finger engage-

able, exterior portion disposed adjacent said trigger so that a person's finger may simultaneously engage said trigger and said exterior portion of said member thereby to move the latter between said two positions, . . . ."

(b) Claim 7 refers to a "reversing member" with a portion thereof ". . . being closely adjacent said trigger so that a person's trigger finger may simultaneously engage said trigger and said reversing member portion. . . ."

(c) Claim 9 refers to a "reversing arm" which ". . . has one end thereof disposed closely adjacent said trigger for engagement by an operator's trigger finger, . . . ."

(d) Claim 10 refers to a "reversing member", with a portion thereof ". . . being closely adjacent said trigger so that a person's trigger finger may simultaneously engage said trigger and said reversing member portion, . . . ."

80. As of July 12, 1965, the date the Frenzel application was filed, the scope and content of the prior art included the following:

(a) The Skil Model 823 electric impact wrench (DX 27; Stip. para. 49), which has a reversing mechanism operated by means of a knob-like device mounted on the tool handle below the trigger. It measures approximately ½" wide and 1¼" long.

(b) Patents 2,425,923 (DX 42), 2,575,523 (DX 43), 2,580,631 (DX 44), 2,693,867 (DX 45), 2,802,556 (DX 46), and 2,903,111 (DX 47), each of which relates to an impact tool, similar to the air impact wrenches sold by Skil in 1963 (DX 28, pp. 44–45). Each patent shows at least one figure which depicts a reversing lever, or similar mechanism, located fairly close to the trigger of the tool; however, none of the patents describe the arrangement between the reversing lever and the trigger, rather each relates to improvements in the impact clutch mechanism (DX 42, 43, 45, 47), or improvements in the impact driving connection (DX 44, 46).

(c) Thomas patent 3,194,898 (Thomas), which relates to selector switches of the trigger actuated type. (PX 25A). One object of this invention is to provide a reversible trigger switch which is especially adapted on a portable tool handle. The reversing mechanism of Thomas is operated by means of turning the front end of the tool trigger.

(d) Obszarny patent 2,390,846 (Obszarny), which refers to a handgrip control switch on the control stick of an airplane (PX 25A). The switch lever is located on the handle. If applied to the handle of a portable tool the reversing lever would be located above the trigger, but on the opposite side of the handle.

(e) Kaman patent 2,744,176 (Kaman), which refers to a switch actuating mechanism for electric tools (PX 25A). The reversing mechanism is operated by means of pushing a device located in the tool handle near the top of, and behind, the trigger. The device protrudes from each side of the handle perpendicular to the plane of the trigger.

81. The difference between the prior art and claims 5, 7, 9 and 10 of the Frenzel patent is as follows:

(a) The Skil Model 823 impact wrench (DX 27) contains all the elements of claim 10 of Frenzel, except for the clause in that claim which reads (PX 24; T 1016–1019), ". . . said reversing member portion being closely adjacent said trigger so that a person's trigger finger may simultaneously engage said trigger and said reversing member portion. . . ." The reversing member of the Skil impact wrench is located below the trigger, and both are located on the tool handle. The trigger finger can simultaneously touch the trigger and reversing member of the impact wrench only by using an unnatural or contorted grip which does not permit normal operation of the trigger or wrench. Under normal operation of the impact wrench the trigger finger cannot simultaneously engage both the trigger and reversing member; whereas normal operation of a tool containing the Frenzel reversing member permits said simultaneous engagement. (T 1026–1028, 1059–1060).

(b) Each impact tool patent (DX 42–47) includes a figure which depicts the trigger of a portable impact tool located on the handle slightly below a reversing lever. No physical devices which embody these patents were introduced into evidence, nor was there any testimony concerning same. There is no language in any of these patents which states that the trigger finger operating the trigger may simultaneously, or at the same time, engage a reversing lever. Although defendants argue the two dimensional figures of these prior art patents show such a relationship, the lack of any additional evidence renders the figures insufficient to reach such a conclusion. The difference between these prior art patents and Frenzel is that Frenzel defines a relationship, under normal operating conditions, between the trigger, trigger finger and reversing lever which the impact tool patents fail to disclose.

(c) Although the reversing member of Thomas comprises the end of the tool trigger, the reversing member cannot be operated by the trigger finger alone (PX 25, pp. 32–33; PX 25A, at Thomas patent, column 1, lines 59–61).

(d) Under Obszarny the operator cannot use his trigger finger to operate, or engage, the reversing member while at the same time he operates the trigger (PX 25, p. 32).

(e) The Kaman reversing member is operated in one direction by using the thumb, rather than by using the trigger finger. Moreover, during operation of a Kaman drill the operator cannot simultaneously operate, or engage, the reversing member with his trigger finger. (PX 25, pp. 31–33; PXR 49; T 3470–3472, 3487).

82. The level of ordinary skill in the art as of July 12, 1965, was as follows:

(a) The only expert witness to testify concerning the Frenzel patent was Mr. Gawron, and his testimony was primarily directed toward whether the accused device was covered by the Frenzel patent, although he did testify that the Skil 823 Model impact wrench had all the elements of Frenzel's claim 10, except for the element showing a particular relationship between trigger, trigger finger and reversing member. Essentially, the level of ordinary skill in the art was that reflected by the prior art and Mr. Gawron's testimony.

(b) Defendants have failed to produce any expert testimony showing the level of ordinary skill in the art, or showing that the Frenzel patent was obvious to a mechanic of ordinary skill in the art.

83. As noted earlier, Skil sued Lucerne in 1968 on the license agreements concerning the Gawron and Frenzel patents. By order filed June 13, 1979, the United States District Court for the Northern District of Illinois, where this action was originally filed, granted summary judgment on Count III of the complaint, which sought royalties from Lucerne for the sale of switches covered by the Frenzel patent (PX 126). Lucerne subsequently moved to vacate this judgment, but the motion was denied by order filed September 24, 1970 (PX 127). In denying the motion to vacate the court noted that at no time in the proceedings up to that point had Lucerne even remotely raised the issue of validity of the Frenzel patent (*Id.*, pp. 14–15).

84. The action filed in the Northern District of Illinois was subsequently transferred to this court. By order dated May 10, 1972, Lucerne was permitted to file its third amended answer and counterclaim (DX 143). The third amended answer raised the issue of validity of the Frenzel patent. Thereafter Skil filed a motion seeking summary adjudication on the issue of Lucerne's right to raise the issue of validity. On August 20, 1977, the motion was denied (PX 128). The court noted that Skil had filed a supplemental complaint asserting a fourth count in this action involving the Frenzel patent, and that in the interest of justice it had granted Lucerne leave to file second and third amended answers. In denying the motion the court stated in part that (*Id.*, p. 6):

To the extent defendant Lucerne does not raise the issue of validity of the Frenzel patent as to Count III of the complaint in C69–461, the court finds Lu-

cerne's assertion of certain defenses and claims in its second and third amended answers is not manifestly inconsistent with the prior September 24, 1970 ruling of Judge Will.

85. When Judge Will entered summary judgment on Count III, and later refused Lucerne's motion to vacate, Mr. Matthews was not a defendant in this action. He was made a party defendant approximately seven years later, in 1977, and he has separately raised the issue of validity of the Frenzel patent.

### Conduct of Skil

86. Application for what eventually became the Frenzel patent was filed in the United States Patent Office on July 12, 1965 (PX 25, cover page). On November 8, 1965, Skil's attorney submitted a Request for Special Status (*Id.*, pp. 29–36), and in connection therewith made a pre-examination search, which identified the relevant prior patents as Thomas, Obszarny, and Kaman (*Id.*, p. 30). These patents were called to the attention of the Patent Office accompanied by arguments to distinguish them from the Frenzel application (*Id.*, pp. 30 ff.). Following a number of supplemental amendments the Patent Office mailed formal notice of allowance on March 14, 1966 (*Id.*, p. 50), and the Frenzel patent was granted on July 12, 1966 (PX 24).

87. Included among the prior art which was not cited or referred to by Skil in its patent application was the Skil Model 823 electric impact wrench (DX 27; Stip. para. 49).

(a) This Skil tool contained all the elements of claim ten of the Frenzel patent with the exception (T 1016–1019) of the clause which reads (PX 24):

. . . said reversing member portion being closely adjacent said trigger so that a person's trigger finger may simultaneously engage said trigger and said reversing member portion, . . . . .

(b) The Skil wrench was no more relevant or material prior art than the Kaman patent which Skil had disclosed to the Patent Office (T 3470–3472, 3487). The Fren-

zel patent would have issued even if the Skil impact wrench had been cited as prior art.

(c) There is no evidence that Skil intentionally withheld the Skil Model 823 impact wrench from the Patent Office.

88. Skil's national account with J. C. Penney (*see* Findings of Fact 56 and 57) included the sale of products, including drills, which incorporated the Frenzel invention. Some of these drills were sold below cost, while others were sold at a profit. During the same period Skil sold other products, including drills, which did not incorporate the Frenzel invention. These drills were sold below cost, while others were sold at a profit. An example of each of these categories shows the following during the April 5, 1973, or September 1, 1974, contracts (DX 120A, 142):

(a) A drill containing the Frenzel invention, designated as part 457–5:49, was sold for a 2.1% profit (September 1, 1974).

(b) A drill containing the Frenzel invention, designated as part 597–6:49, was sold at a loss of 1.9% (September 1, 1974).

(c) A drill which did not incorporate the Gawron invention, designated as part 541–5:49 was sold for a profit of 10.4% (April 5, 1973).

(d) A drill which did not incorporate the Frenzel invention, designated as part 503–10:49, was sold at a loss of 16.2% (September 1, 1974).

89. There is no evidence to show that Skil conditioned the sale to J. C. Penney of one product upon the sale of another product, or that Skil conditioned the sale of a product with the Frenzel patent device upon the sale of any other product. There is no evidence that those Skil products containing the Frenzel invention which were sold below cost were sold in that manner because they contained the invention. There is no evidence to show that during any contract period the total loss from sales of products containing the Frenzel invention exceeded the total profit made from sales of other products containing the Frenzel invention.

Devices Covered by the Frenzel Patent

90. On April 11, 1967, Skil and Lucerne entered into a nonexclusive license agreement concerning the Frenzel patent (T 667–670; PX 104). This license agreement has remained in force and effect since that date.

91. Lucerne has manufactured three types of reversing switches: (1) Model A, which includes a forwardly extending reversing lever; (2) Model B, which has its reversing lever protruding from the side of the tool handle, approximately perpendicular to the plane of the trigger; and (3) Model C, which has its reversing lever extending in a rearward direction.

(a) Lucerne concedes that its Model A switch is within the scope of the Frenzel license, which is confirmed by comparing this switch to the Frenzel patent (PX 29; 29A; 44, at Interrog. Answers 40–42; 77, p. 122).

(b) Skil does not contend that the Frenzel patent covers the Model C switch.

(c) The remaining issue is whether the Model B switch is covered by the Frenzel patent. This switch is manufactured and sold by Lucerne as TSCRA 252, 254 or 256 switches, TSCR 252, 254, or 256 switches, and TRMR switches (PX 30, 31, 33A; Stip. paras. 37, 38, 42).

92. Mounting the Lucerne Model B reversing switch in a portable drill (PX 13, 32) results in the following. The operating, or reversing, lever of the switch protrudes through a slot cut into the handle of the drill, located a short distance behind the trigger, on an imaginary line extending backward from the top of the trigger. The reversing lever protrudes out of the left side of the handle. In one of its two positions the lever is perpendicular to the plane of the trigger. When pushed into the second position, thereby reversing the rotation, the lever is pushed toward the trigger. The location of the Model B reversing lever relative to the trigger is approximately that of the left end of the reversing button described in the Kaman patent (T 576; PXR 49).

93. The location of the reversing lever of the Lucerne Model B switch in a drill results in the following relationships:

(a) When holding the drill handle in the right hand the Model B reversing lever would be normally operated by the right thumb, without changing the operator's grip on the handle. (PX 13, 32; T 562). By comparison, operation of the reversing lever with the trigger finger of the right hand would require a slight change, or shift, of the handgrip on the ·drill handle (T 1002–1003, 1020).

(b) When holding the drill handle in the left hand the Lucerne Model B reversing lever is in a different relationship with the trigger and the operator's hand. The operator cannot operate the reversing lever with his left thumb unless he changes his grip on the handle. To operate the reversing lever with the left-hand trigger finger the operator must slightly shift, or change, his grip (T 564–565; PX 13, 32), and a different portion of the left-hand trigger finger is used than is used by the right-hand trigger finger.

(c) The difference in relationship between the hand, trigger, and Lucerne Model B reversing lever, depending upon whether the drill is being operated by the right or left hand, is in contrast to a physical embodiment of the Frenzel reversing lever and switch as portrayed in the figures of the patent. With such a Frenzel embodiment there is no difference in relationship, whether using the left or right hand. Moreover, this physical embodiment renders it unnecessary to shift or change the handgrip in operating the reversing lever. (PX 24, 27; T 303–306).

94. The file wrapper history of Frenzel reflects that in seeking to distinguish Kaman from Frenzel it was noted in part that the simultaneous relationship called for by Frenzel permitted the operator to change direction of rotation "in a rapid manner"; whereas, with Kaman the reversing member could not be manipulated by the trigger finger alone, and the operator "must change his grip . . . before actuating the reversing mechanism" (PX 25, p. 33).

In seeking to distinguish Thomas it was argued in part that the reversing member could not be "readily rotated" by the trigger finger alone, rather it "requires the operator to change his grip" on the tool and rotate the reversing mechanism with two fingers. (*Id.*, p. 32). In seeking to distinguish Obszarny it was argued in part that the reversing member thereof could not be "manipulated by the trigger finger alone without the operator practically releasing the handgrip." (*Ibid.*) In addition to this file wrapper history, at trial Mr. Gawron distinguished the Skil Model 823 impact wrench in part by noting that simultaneously touching the trigger and reversing member thereof could only be accomplished by means of an unnatural or contorted grip (T 1026–1028, 1050–1060).

(a) Changing the normal grip on the drill handle negatives the Frenzel element of "operating" the trigger at the same time as engaging the reversing lever. Once the grip is changed there can no longer be the normal trigger operation which is implicitly called for by Frenzel. (PX 24; T 1059–1060).

95. To hold that the Lucerne Model B reversing switch is covered by the Frenzel patent would be to ignore the fact that when holding and normally operating a drill with the right hand the operator will reverse rotation by using his right thumb to manipulate the reversing lever rather than by using his right trigger finger. Indeed, using the right thumb permits operation of the trigger simultaneously with engaging or operating the reversing lever; whereas using the right trigger finger fails to meet this simultaneity requirement since a shift in the handgrip is required.

96. The Lucerne Model B reversing switch is not covered by the Frenzel patent, nor is the switch equivalent to the Frenzel patent.

### Defendants' Sales Activities

97. Only Lucerne and Mr. Matthews have been sued on the Frenzel license agreement. Sales of Model A devices incorporating the Frenzel patent total one hundred forty-two thousand two hundred fifty-three dollars ($142,253.00), with the royalty called for in the license agreement totaling fourteen hundred twenty-four dollars ($1424.00). Adding simple six percent interest to the royalties due gives a total of fifteen hundred eighty-nine dollars ($1589.00) in royalties and interest (PX 142–154).

## DISCUSSION AND CONCLUSIONS OF LAW

### Jurisdiction and Venue

This court has jurisdiction over the subject matter of the C69–461 action, 28 U.S.C. § 1332, and it has proper venue as to all defendants. 28 U.S.C. §§ 1391, 1404(a); see Stip. paras. 7, 9. This court has jurisdiction over the subject matter of the C74–121 action, 28 U.S.C. § 1338, and it has proper venue as to all defendants. *Skil Corp. v. Millers Falls Co.*, 541 F.2d 554 (6th Cir. 1976), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 631; 28 U.S.C. §§ 1400(b), 1404(a); see Stip. paras. 8, 10, 11.

## THE GAWRON PATENT

### Validity

There are three essential elements of patent validity: novelty, utility and nonobviousness, which are codified in 35 U.S.C. §§ 101–103. The third element, nonobviousness, is actually the statutory equivalent of the judicial test of invention. *Reynolds Metals Co. v. Acorn Building Components, Inc.*, 548 F.2d 155 (6th Cir. 1977).

 Since the Gawron patent was issued by the Patent Office it carries the statutory presumption of validity, which places the burden of proof on the party who asserts invalidity. *Id.; Bolkcom v. Carborundum Co.*, 523 F.2d 492 (6th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194; *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708 (6th Cir. 1975), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303. Defendants contend the Gawron patent is obvious. In this case the burden is upon the defendants to prove obviousness by a preponderance of the evi-

dence. *Dickstein v. Seventy Corporation,* 522 F.2d 1294 (6th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644.

■ The fact the Seventh Circuit has already held the Gawron patent to be valid, *Skil Corporation v. Cutler-Hammer, Inc., supra,* greatly enhances the statutory presumption of validity. *American Home Products Corp. v. Lockwood Mfg. Co.,* 483 F.2d 1120 (6th Cir. 1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 917, 39 L.Ed.2d 110. A prior adjudication of validity should be followed "unless the court is convinced of 'a very palpable error in law or effect.'" *Cold Metal Process Company v. Republic Steel Corp.,* 233 F.2d 828, 837 (6th Cir. 1956), *cert. denied,* 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86.

■ The ultimate determination of validity and obviousness is one of law, *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Reynolds Metals, supra,* but the initial inquiry into obviousness entails several basic factual examinations, *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill and the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

■ A secondary consideration such as commercial success may have relevancy to the issue of obviousness, *Id.,* at pp. 17–18, 86 S.Ct. at 693–694, although commercial success alone will not render a patent valid. *Reynolds Metals, supra; Goodrich-Gulf Chemicals, Inc. v. Phillips Petroleum Co.,* 376 F.2d 1015 (6th Cir. 1967). Skil's receipt of over a million dollars in royalties under the Gawron patent and the fact it is the subject of many royalty-bearing licensing agreements provides some evidence of commercial success. *See Cold Metal, supra.*

■ The Gawron patent is a combination patent. Accordingly, the issue is whether the combination of old elements produces a new or different function. *Reynolds Metals, supra.* The test of obviousness for a combination patent is defined as follows, *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.,* 562 F.2d 365, 370 (6th Cir. 1977):

The synergistic test is met when a combination of elements produces an effect which is 'greater than the sum of the several effects taken separately.' . . There must be an 'impalpable something' in the combination itself which consists of previously known elements to pass the requirement of nonobviousness. . . . Stated another way, there must be some 'unusual or surprising result' from a combination of old elements. . . .

The key to the obviousness issue is whether it was obvious in September of 1962 to a mechanic of ordinary skill in the pertinent art to combine human feedback with a trigger and with an SCR speed control circuit to achieve speed control of an electric drill or other relevant device. The pertinent art was the use of an SCR in speed control circuitry, which was a relatively new art.

Prior to Gawron the use of SCR speed control circuitry to control the motor of a hand drill was reflected in the Australia patent, which used a knob to preset the desired speed, then maintained that speed by an inherent, or automatic, SCR feedback circuit. This conformed to Gutzwiller, who stated that to achieve constant speed under varying load conditions it was necessary to use an SCR circuit which had inherent, or automatic, feedback. He taught that the use of human feedback would not succeed.

■ The Gawron patent specifically refuted the teaching of Gutzwiller. Gawron stated that human feedback would maintain constant motor or drill speed under varying load conditions, which was an unusual or surprising result. In light of Gutzwiller Gawron's use of human feedback was not obvious to a mechanic of ordinary skill in the art, thus the Gawron invention was nonobvious.

**1158**

■ Rejection in Canada of an application for a patent virtually identical to the claims of the Gawron patent has been considered. *See American Infra-Red Radiant Co. v. Lambert Industries Inc.,* 360 F.2d 977 (8th Cir. 1966), *cert. denied,* 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144. In view of the fact this court is unable to find substantial identity between the Canadian and United States patent laws, and is further unable to find that there were substantially identical facts and circumstances surrounding the United States and Canadian applications, *see Timely Products Corporation v. Arron,* 523 F.2d 288 (2nd Cir. 1975); *Evans v. Watson,* 142 F.Supp. 225 (D.C.1956), the impact of the Canadian rejection is insufficient to overcome the contrary evidence of nonobviousness.

### Priority of Invention

Defendants contend that Skil is not entitled to the Gawron patent by reason of 35 U.S.C. § 102(g) which states:

A person shall be entitled to a patent unless—

. . . . .

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

■ A strict standard of proof is required to show priority of invention. The burden is on the defendants to show by clear and convincing evidence that not only was there a reduction to practice of the Lucerne speed control device, but also that

it took place prior to the invention date of Gawron. *Dickstein, supra; Campbell v. Spectrum Automation Company,* 513 F.2d 932 (6th Cir. 1975).

■ An invention is reduced to practice under § 102(g) by building a working model and operating it under simulated field conditions, without the necessity of showing successful commercial use. However, it does demand tests which successfully prove practical utility for its intended use. *Ajem Laboratories, Inc. v. C. M. Ladd Co.,* 424 F.2d 1124 (6th Cir. 1970), *cert. denied,* 400 U.S. 830, 91 S.Ct. 59, 27 L.Ed.2d 60; *Toledo Scale Corp. v. Westinghouse Electric Corp.,* 351 F.2d 173 (6th Cir. 1965). *Ajem* adopted the standard for a satisfactory reduction to practice outlined by the Court of Customs and Patent Appeals in *Field v. Knowles,* 183 F.2d 593, 601, 37 CCPA 1211 (1950):

To constitute an actual reduction to practice of a machine, the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. . . . Unless the device is of such a nature that by its very simplicity its practical operativeness is manifest, . . . the machine must be tested under actual working conditions . . . in such a way as to demonstrate its practical utility for its intended purpose . . . beyond probability of failure . . . . Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful. . . .

■ Defendants rely substantially upon oral testimony of the two inventors of the Lucerne device.[1] Their testimony, and the other evidence of defendants, is not of sufficient credibility to clearly and convincingly show that the Lucerne speed control

---

1. The failure of defendants to call as witnesses three individuals whose testimony may have been relevant does not permit the negative inference that their testimony would have been unfavorable to the defendants. There has been no showing that as of the trial date these witnesses were peculiarly within the control or power of the defendants to produce them, thus the requirements for drawing a negative inference have not been shown. *United States v. Blakemore,* 489 F.2d 193 (6th Cir. 1973).

device was reduced to practice prior to September 28, 1962, the filing date of the Gawron application. The cryptically described testing which allegedly occurred prior to September of 1962 did not constitute a reduction to practice. Among other problems, the Lucerne testing failed to show that the prototype drill could operate under actual working conditions, such as drilling into wood or other material. The testing further failed to show that constant speed could be maintained when a varying load was applied to the prototype drill.

 Assuming there was a reduction to practice in December of 1960, the failure of Lucerne to disclose its speed control device for thirty-six months thereafter, in late 1963 or early 1964, constituted suppression or concealment. During this period of time Lucerne primarily sought to obtain a retrofit feature, a feature which was not an element of either the Gawron patent or Lucerne's own patent application of March, 1964. *See Horwath v. Lee*, 564 F.2d 948 (Cust. & Pat.App.1977); *Young v. Dworkin*, 489 F.2d 1277 (Cust. & Pat.App.1974); *International Glass Company v. United States*, 408 F.2d 395, 187 Ct.Cl. 376 (1969).

Defendants have failed to show that the activities of Mr. Rhine and Mr. Matthews in developing the Lucerne speed control device constituted prior invention pursuant to § 102(g).

### Fraud On the Patent Office

Defendants contend that the Gawron patent is invalid since it was obtained by means of fraud on the Patent Office, and further contend it is unenforceable by reason of the closely associated defense of inequitable conduct before the Patent Office.

 Not having testing facilities of its own, the Patent Office must rely upon information furnished by applicants and their attorneys. Mr. Gawron, like all other applicants, stood before the Patent Office in a confidential relationship and owed the obligation of frank and truthful disclosure. *Charles Pfizer & Co. v. F. T. C.*, 401 F.2d 574 (6th Cir. 1968) *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453.

In *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949), the Supreme Court quoted with approval the following:

By reason of the nature of an application for patent, the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to applicants, the Office . . . must rely upon their integrity and deal with them in a spirit of trust and confidence . . . .

In *Precision Co. v. Automotive Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945) the Supreme Court said:

Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue. . . . Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies.

Since the decision of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), fraud defenses (which will hereafter include the inequitable conduct defense) in patent suits have been asserted with increasing frequency. Those decisions in which the defense has prevailed are not easily reconciled nor subject to simple classification. *See In Re Multidistrict Litigation Involving Frost Patent*, 398 F.Supp. 1353 (D.Del.1975), *modified*, 540 F.2d 601 (3rd Cir. 1976). An example of disagreement is manifested by *Monsanto Company v. Dawson Chemical Company*, 312 F.Supp. 452 (S.D.Tex.1970), *cert. denied*, 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248, and *Monsanto Company v. Rohm and Haas Company*, 312 F.Supp. 778 (E.D.Pa.1970), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817, *reh. denied*, 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 158, which

reached opposite conclusions as to whether fraud on the Patent Office occurred with reference to the same patent.

There does appear general agreement that a fraud defense requires the showing of at least two elements: (1) willful, wrongful conduct or intent before the Patent Office; and (2) the wrongful conduct or intent must have been in relation to a "material" matter before the Patent Office. However, courts remain in disagreement concerning the appropriate standards for these two elements. *Frost, supra.*

Concerning the element of intent, the Sixth Circuit requires that "mere technical" fraud is not sufficient. Rather, scienter or fraudulent intent is considered to be an integral part of the fraud defense. *Kearney, supra; Kolene Corporation v. Motor City Metal Treating, Inc.*, 440 F.2d 77 (6th Cir. 1971), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169. Defendants rely heavily upon *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555 (5th Cir. 1970), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264. The Sixth Circuit utilized *Beckman* indirectly to define the intent element when it was distinguished in *Schnadig Corporation v. Gaines Manufacturing Co., Inc.*, 494 F.2d 383, 393 (6th Cir. 1974): "In *Beckman* the patentee deliberately and knowingly concealed a reference that was known to be anticipatory and intentionally made misrepresentations to the Patent Office. In short there was an intent to deceive." *Schnadig* further defined the intent element by noting that, "In *Monsanto*, although the court did not require a specific intent to deceive, the patentee had intentionally made misrepresentations by presenting half-truths to the Patent Office and deliberately made representations that were inconsistent with those made on two prior occasions." (*Ibid.*)

The fraudulent intent element must be associated with a material matter. In *Schnadig* the court did not condone certain practices of the patentee, but denied the fraud and unclean hands defenses since there was no evidence to show that "pertinent and material evidence was concealed

from the Patent Office." (*Id.*, p. 392). In *Charles Pfizer, supra*, the court referred to facts which were so material that the patent would not have been issued by the hearing examiner but for the misrepresentation or withholding of said facts. An earlier opinion in the same case, *American Cyanamid Company v. F. T. C.*, 363 F.2d 757 (6th Cir. 1966), set forth a number of "material questions" which were not answered by the evidence, all relating to the hearing examiner's knowledge and state of mind when issuing the patent. *Id.*, p. 777. The Court set forth "ultimate questions" on the issue as being: (1) Did the hearing examiner receive all the information that he had requested? (2) Was the hearing examiner misled and deceived? and (3) Did the hearing examiner grant the patent as the result of such deception? *Id.*, p. 778.

■ Fraud is not to be lightly inferred. It must be established by "clear, unequivocal and convincing" evidence. *Kearney, supra; Schnadig, supra.* Defendants rely upon numerous factual incidents in arguing that such evidence exists. Consideration of these incidents, singly or in combination, fails to establish clear, unequivocal and convincing evidence of fraud on the Patent Office. Analysis of defendants' allegations will be limited to the most pertinent incidents.

Defendants contend Skil had a duty to disclose the Lucerne device to the Patent Office. Fundamental to this claim is the invention date of the Lucerne device. If the Lucerne date preceded Gawron's it was obviously material to the Patent Office; however, if the Lucerne device did not precede Gawron it was not material. The precise Lucerne date of invention remains unknown, and, as noted earlier, there is no clear and convincing evidence that the Lucerne device anticipated Gawron. This failure of proof is aggravated when viewed within the context of the dearth of information Lucerne provided Skil during the prosecution period of the Gawron patent. Skil first learned of the Lucerne device in early 1964, nearly sixteen months after filing the Gawron application. During the

next twenty months, up to the date the Gawron patent was granted in September of 1965, Lucerne failed to provide Skil with any documentary evidence that the Lucerne device preceded the Gawron application date. Lucerne did no more during this period than claim priority, a claim which under the circumstances Skil had reasonable cause to doubt. In fact Lucerne's counsel essentially conceded in July of 1965 that no proof of prior invention had yet been produced.

The following observation in *H. K. Porter Co., Inc. v. Gates Rubber Co.*, 187 U.S.P.Q. 692, 713 (D.Colo.1975) applies to Skil's alleged duty to disclose the Lucerne device to the Patent Office:

> The standard of fraudulent non-disclosure is not whether a particular type of . . . [speed control device] was or was not disclosed to the Patent Office, but whether the invention claimed [by Gawron] had been previously made or anticipated by the development of . . [Lucerne]. That has not been shown, nor is disclosure of all arguably anticipatory products required to avoid charges of misrepresentation to the Patent Office.

It necessarily follows that Skil's use of a Lucerne device to demonstrate the Gawron invention to the patent examiner in March of 1965 was not fraudulent. The Lucerne device had been manufactured as the result of a purchase order from Skil. Its circuity and method of operation was covered by the Gawron patent. The attraction of the Lucerne device was its retrofit configuration, but this was not an element of the Gawron patent. Even assuming Skil did not inform the Patent Office that it was utilizing the Lucerne retrofit speed control device in its demonstration, there is also no evidence that Skil claimed the retrofit feature as a part of the Gawron invention. Under these circumstances the manufacturing source of the Gawron invention was not material to the Patent Office.

The amendment which Skil filed in March of 1964 placed the SCR speed control circuit in the tool handle. This concept was not pirated from the Lucerne device, rather it came from language in the original Gawron specification, drawing and claims. Moreover, location was not an element of the patent.

In his supplemental oath of May 20, 1965, Mr. Gawron swore in part that "he does not know and does not believe that the same [the Gawron invention] was ever known or used before his invention. . . ." The fact he was aware of the Lucerne speed control device as of February, 1964, did not render his supplemental oath false. Lucerne had yet to produce any evidence that would allegedly prove priority. Under the circumstances it was not unreasonable for Mr. Gawron to hold the belief reflected in his affidavit. *See RPTZ–Patco, Inc. v. Pacific Inland Navigation Company*, 253 F.Supp. 796 (D.Or.1966), *aff'd per curiam*, 377 F.2d 558 (9th Cir. 1967).

Defendants contend fraud on the Patent Office was committed by Skil's alleged misrepresentation of the scope of the Gemmill prior art patent. The alleged misrepresentation is, at worst, ambiguous, and is subject to being interpreted consistent with the actual scope of Gemmill. Since the actual patent was made available to the patent examiner, thus permitting him to reach an independent decision as to its proper scope, there was no fraud. *See General Tire & Rubber Co. v. Jefferson Chemical Co.*, 363 F.Supp. 871 (S.D.N.Y.1973), *rev'd on other grounds*, 497 F.2d 1283 (2nd Cir. 1974), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184.

### Patent Misuse

■ Defendants contend that the Gawron patent is unenforceable on the ground Skil misused the patent in obtaining it, and in subsequently marketing it. The guiding doctrine in patent misuse is the equitable maxim that "he who comes into equity must come with clean hands." *Precision Instrument, supra*. The outer scope of the doctrine has not been clearly defined, *see McCullough Tool Company v. Well Surveys, Inc.*, 395 F.2d 230 (10th Cir. 1968), *cert. denied*, 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261; *Hensley Equipment Company v. Esco Corporation*, 383 F.2d 252 (5th Cir. 1967), *modified*, 386 F.2d 442 (5th Cir. 1967);

*Stearns v. Tinker & Rasor*, 252 F.2d 589 (9th Cir. 1958); nonetheless, a common example of patent misuse is noted in *Morton Salt Co. v. Suppiger*, 314 U.S. 488, 491, 62 S.Ct. 402, 404, 86 L.Ed. 363 (1941):

> A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. But a patent affords no immunity for a monopoly not within the grant . . . , and the use of it to suppress competition in the sale of an unpatented article may deprive the patentee of the aid of a court of equity to restrain an alleged infringement by one who is a competitor.

*See also*, Scarfetta, Joseph Jr., *"Ten Years After ARO II: The Effect of Patent Act Section 271 On the Patent Misuse Doctrine"*, 58 J.Pat.Off.Soc'y 69 (1976).

■ The defense is based upon the public policy considerations. It is not personal in the sense that the misuse must be directed at the infringement suit defendant; however, it cannot be based upon "misuse in the air". The misuse must be of the matter in litigation, to wit, misuse of the patent in suit. An anti-trust offense does not necessarily amount to misuse merely because it involves patented products or products which are the subject of a patented process. *Kolene, supra.*

■ Did the below cost sales to J. C. Penney of Skil products which incorporated the Gawron invention constitute patent misuse? Products which incorporated the Gawron invention were either sold below cost or at a profit. There is no showing that the total sales to J. C. Penney of products incorporating the Gawron invention were sold at an overall loss. Moreover, as to those products which were sold below cost, and which also incorporated the invention, there is no showing that the below cost sales were made by reason of the Gawron invention. Indeed, other below costs sales to J. C. Penney were made of products which did not incorporate the Gawron invention. There is simply no evidence to show that the Gawron invention was a factor in determining whether to sell certain products below cost to J. C. Penney, nor is there any evidence to show that the sale of certain Skil tools was tied to the sale of the Gawron invention. There is also no evidence showing that the below cost sales adversely affected Wen. Under these circumstances the defendants have failed to show misuse of the Gawron invention based upon the J. C. Penney account.

■ The goal and efforts of Skil to obtain an exclusive position in the field of trigger speed control did not constitute a patent misuse. The evidence shows that Skil did no more with its Gawron application and patent than legally entitled. Any allegedly objectionable activities of Skil did not involve use of the Gawron patent.

■ Skil's cancellation of its license agreement concerning the Gawron invention, coupled with its notification to customers of Lucerne that said agreement was cancelled, did not constitute patent misuse. Fundamental to this contention is the issue of whether Skil had the legal right to cancel the agreement, which is an issue involving principles of contract law rather than patent misuse.

■ Skil's conduct before the Patent Office did not constitute patent misuse. While it is difficult to clearly define the outer boundaries of patent misuse, one difference between it and fraud on the Patent Office is that the patent misuse may be purged, after which the patent may once again be enforced, whereas fraud on the Patent Office infects the initial grant of the patent, thus is not capable of being purged. *See Kearney & Trecker, supra.* Skil's conduct before the Patent Office is more appropriately considered under the issue of fraud on the Patent Office.

Under all the circumstances the defendants have failed to show that any conduct of Skil constituted patent misuse.

Devices Covered By the Gawron Patent

■ In determining whether a patent has been infringed by an accused device two tests must be applied. The first test is whether there is literal infringement of the

patent. In making this determination, the words of the patent claim must be compared with the accused device. If the accused device is clearly within the claim, then infringement does exist. If there is no literal infringement the second test must be applied, that being the doctrine of equivalents. *Acme Highway Products Corp. v. D. S. Brown Co.*, 473 F.2d 849 (6th Cir. 1973), *cert. denied*, 414 U.S. 824, 94 S.Ct. 125, 38 L.Ed.2d 57. These tests of infringement are equally applicable to the issue of whether the accused Lucerne devices come within the Gawron patent for the purposes of the license agreement between Skil and Lucerne. *Maxon v. Maxon Construction Company*, 395 F.2d 330 (6th Cir. 1968); *Cold Metal Process Co. v. United Engineering & Fdry. Company*, 235 F.2d 224 (3rd Cir. 1956).

Lucerne manufactured two basic forms of speed control devices: (1) the TSC 113/114 model and (2) the TSC 254 model. The TSC 113/114 model literally infringes the Gawron patent; therefore, it is covered by the license agreement.

The major issue concerns the TSC 254 device. Since its timing circuit is in a parallel relationship with the motor, and the claims of the Gawron patent are limited to a series relationship, it does not literally infringe the Gawron patent. Thus it must be analyzed pursuant to the second test, the doctrine of equivalents.

■■■ Skil may invoke this doctrine if the TSC 254 performs substantially the same function in substantially the same way to obtain the same result. A finding of equivalence is a determination of fact, which relies upon the following considerations, *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950):

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

The Sixth Circuit defines the "essence" of the doctrine as, *Cardinal of Adrian, Inc. v. Peerless Wood Prod. Inc.*, 515 F.2d 534, 540 (6th Cir. 1975): " 'if two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same, even though they differ in name, form or shape' ".

The inventive concept of the Gawron patent is the use of human feedback in combination with a trigger and SCR circuitry to achieve speed control. The limitation in the Gawron patent of connecting the timing circuit in series relationship with the motor does not pertain to the inventive concept of Gawron, but rather to its environment; therefore, the series connection does not preclude reliance on the doctrine of equivalents. *Olympic Fastenings Systems, Inc. v. Textron, Inc.*, 504 F.2d 609 (6th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762.

■■■ The Lucerne TSC 254 and a Gawron patent device do the same work since each controls the amount of voltage and current being supplied to the motor, hence the motor speed. Both do this work in substantially the same way since each combines the same electrical and mechanical components with human feedback. Both accomplish the same result since each achieve speed control. Under these circumstances the TSC 254 is equivalent to a device literally covered by the Gawron patent. Skil is entitled to royalties under the license agreement for the sales of the TSC 254 devices.

Cancellation of the License Agreement

In November of 1970 Skil cancelled its 1965 license agreement concerning the Gawron patent. Skil contends that Lucerne's breach of contract permitted cancellation; whereas, Lucerne contends Skil had no right to cancel, and the license agreement remains in effect.

■ Since the agreement had no express term of years it was in effect for the lifetime of the Gawron patent. During this term neither party had the unilateral right to cancel or terminate the agreement, without cause, outside the express provisions therein. *St. Paul Plow Works v. Starling,* 140 U.S. 184, 11 S.Ct. 803, 35 L.Ed. 404 (1891); *Motor Parts Co. v. Packard Co.,* 124 Ohio St. 363, 178 N.E. 835 (1931); *Ohio Citizens Trust Co. v. Air-Way Electric App. Corp.,* 56 F.Supp. 1010 (N.D.Ohio 1944); *Deye v. Quality Engraving & Electrotype Co.,* 100 N.E.2d 310, 60 Ohio Law Abstract 387 (Ohio Com.Pl.1950), *reversed on other grounds,* 90 Ohio App. 324, 106 N.E.2d 584 (1951), *appeal dismissed,* 157 Ohio St. 514, 105 N.E.2d 873 (1952).

■ Lucerne breached the license agreement by failing to pay royalties on either type of speed control device. Between 1964 and late 1968 Lucerne failed to pay royalties on its TSC 113/114 model despite conceding that royalties were due. Lucerne's failure to pay royalties on the TSC 254 device, first manufactured in 1968, was based upon the honest argument that it was not covered by the Gawron patent. Since the TSC 254 is within the patent, failure to pay royalties thereon constituted a beach of contract. Moreover, Lucerne's 1968 notification that it would not pay any royalties on the TSC 254 constituted an anticipatory breach of all future quarterly payments due on that device. *Morpul, Inc. v. Crescent Hosiery Mills,* 265 F.Supp. 279 (E.D.Tenn. 1967); *see also Wallace Clark & Co., Inc. v. Acheson Industries, Inc.,* 422 F.Supp. 20 (S.D.N.Y.1976).

■ There is no cancellation clause in the license agreement for the nonpayment of royalties; however it is unnecessary to determine whether Lucerne's failure to pay royalties gave Skil the right to cancel. A right of cancellation may be waived by the licensor. *Specialities Development Corp. v. C-O-Two Fire Equipment Co.,* 207 F.2d 753 (3rd Cir. 1953); *Miami Cycle & Mfg. Co. v. Robinson,* 245 F. 556 (6th Cir. 1917); *Washburn & Moen Manuf'g. Co. v. Cincinnati Barbed Wire F. Co.,* 42 F. 675 (S.D.Ohio 1890); H. Einhorn, Patent Licensing Transactions (1978), § 4.03(a); R. Nordhaus, Patent License Agreements (1967), § 44; R. Ellis, Patent Licenses (3rd Ed.1958), § 316. It was held in *Kittle Mfg. Co. v. Davis,* 8 Cal.App.2d 504, 47 P.2d 1089 (1935) that when a licensee failed to pay royalties the licensor had a right to treat the license agreement as terminated and sue for damages, or he had a right to sue on the agreement for royalties, but he could not do both. The right to terminate was waived when he sued for recovery of royalties. *See generally, English v. Nat'l. Cas. Co.,* 138 Ohio St. 166, 34 N.E.2d 31 (1941).

■ In 1968 Skil sued Lucerne for royalties due on the Gawron license. Skil did not ask the court to cancel the agreement, rather Skil asked the court to treat the agreement as binding and order royalties be paid on both the TSC 113/114 and TSC 254 devices. By filing its 1968 lawsuit seeking royalties allegedly due on the contract Skil waived whatever right it had to cancel for the past nonpayment of royalties.

Lucerne continued to manufacture its first type of speed control device, the TSC 113/114, a few months beyond the 1968 filing of Skil's lawsuit. However, the conduct of Skil which constituted a waiver continued beyond the filing date. Thereafter, Skil sought summary judgment on the Gawron license, and partial summary judgment was entered on June 13, 1969, ordering Lucerne to account for all speed control devices sold under the license agreement. This judgment included the remaining 1968 manufacture of the TSC 113/114. Seeking and obtaining this summary judgment in 1969 constituted a waiver of any right Skil had to cancel by reason of Lucerne's failure to pay royalties on the TSC

113/114 devices manufactured subsequent to the lawsuit filing date.

After 1968 Lucerne exclusively manufactured the TSC 254 device, thus Lucerne's continuing failure to pay royalties in 1969, 1970, and thereafter, was related to its contention that the TSC 254 was not covered by the Gawron license. Since this continuing failure to pay had been anticipated in 1968 (*Morpul, supra; Wallace Clark & Co., supra*) any right to cancel based thereon had been waived by filing the lawsuit.

In summary, the conduct of Skil in filing its lawsuit, and obtaining a partial summary judgment thereon, acted as a waiver of any right it had to cancel the license agreement based upon nonpayment of royalties. The remaining issue is whether there was other conduct of Lucerne which gave Skil the right to cancel in 1970.

The license agreement is not completely silent as to a right to cancel. It gives such a right under certain conditions relating to the licensor's failure to stop infringement by third persons; however, there is no cancellation provision in the event of action or inaction by the licensee. There being no relevant cancellation provision, it was necessary for Skil to show that Lucerne had either abandoned the contract or done something so gravely violative of its terms that irreparable injury resulted to Skil. *Cold Metal Process Co. v. United Engineering & F. Co.,* 107 F.2d 27 (3rd Cir. 1939); *see generally, Ellis, supra,* § 394. Ellis notes that to permit termination by the licensor the conduct of the licensee must be such as to indicate an intention to repudiate the contract. *Id.,* § 306; *see generally, Cantor v. Cantor,* 174 N.E.2d 304, 86 Ohio Law Abstract, 452 (Ohio Prob.Ct.1959).

In 1970, subsequent to *Lear, supra,* but prior to Skil's November declaration of cancellation, the summary judgment against Lucerne was vacated and Lucerne was permitted to allege invalidity of the Gawron patent as a defense to Skil's 1968 lawsuit. This assertion of patent invalidity was not inconsistent with Lucerne continuing to maintain that the license agreement remained in effect. *PPG Industries, Inc. v.*

*Westwood Chemical, Inc.,* 530 F.2d 700 (6th Cir. 1976), *cert. denied,* 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86; *Warner-Jenkinson Co. v. Allied Chemical Corp.,* 567 F.2d 184 (2nd Cir. 1977). The seeming inequity of permitting a licensee to keep his license while at the same time he attacks patent validity is outweighed by the public interest in placing no impediment in the way of those in the best position to contest validity of the underlying patent. *Lear, supra; Warner-Jenkinson, supra.*

The circumstances of this case are similar to those in *Crane Co. v. Aeroquip Corporation,* 356 F.Supp. 733, 364 F.Supp. 547 (N.D. Ill.1973), *aff'd in pert. part,* 504 F.2d 1086 (7th Cir. 1974), wherein: (1) the licensee modified the originally licensed product, (2) the licensee refused to pay royalties on the modified product, (3) there was an honest dispute as to whether the modified product was covered by the underlying patent, and (4) the licensee challenged validity of the underlying patent. *Crane* ruled that the licensor was not permitted to terminate the license agreement. Those post-*Lear* precedents cited by Skil (*Warner-Jenkinson, supra; Nebraska Engineering Corp. v. Shivvers,* 557 F.2d 1257 (8th Cir. 1977); and *Kraly v. National Distillers and Chemical Corporation,* 502 F.2d 1366 (7th Cir. 1974)) involved dissimilar circumstances, including the absence of one or both of the following factors which are in this case: (1) the license agreement failed to contain a cancellation clause in the event of any action or inaction by the licensee; and (2) there was an honest dispute as to whether an accused product (which was a modification of the product being manufactured at the time the license agreement was initially entered into) came within the terms of the Gawron patent.

The only remaining arguably relevant conduct of Lucerne is that Skil heard from its licensees that Lucerne was holding itself out as a licensed source. However, there was no showing that Lucerne was doing so in any manner inconsistent with the allegations of Skil's 1968 complaint that Skil and Lucerne had a license agreement, and that

they disagreed as to whether the TSC 254 was covered by said agreement. It was not shown that Lucerne told others its TSC 254 came within the Gawron license.

Based upon (1) the absence of any provision in the license agreement permitting cancellation by reason of any action or inaction of the licensee, and (2) Skil's 1968 lawsuit for royalties due on the agreement, Skil did not have the right to cancel in 1970. Skil's recovery is limited to whatever relief is permitted under the agreement.

### Relief

Skil is entitled to interest on the unpaid royalties from the time when they should have been paid. *Gridiron Steel Co. v. Jones & Laughlin Steel Corp.*, 361 F.2d 791 (6th Cir. 1966). The rate of interest when not stipulated is six percent per annum under Ohio law. Ohio Rev. Code § 1343.03. When simple interest is computed to the royalties due under the Gawron license the total is two hundred ninety-two thousand four hundred ninety dollars ($292,490.00). Since the Skil-Lucerne license agreement remains in effect this total of royalties plus interest is owed to Skil by Lucerne.

■ The other corporate defendants, as purchasers of the accused speed control devices from Lucerne, are not liable under any theory for the royalties and interest since they purchased from a licensed source. *Boston Store v. American Graphophone Co.*, 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551 (1918); *Bauer v. O'Donnell*, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041 (1912); *Extractol Process v. Hiram Walker & Sons*, 153 F.2d 264 (7th Cir. 1946); *see generally*, 4 Deller's Walker on Patents (2d Ed.), §§ 386, 391.

■ Since the license agreement has remained in effect there has been no infringement of the Gawron patent, thus Mr. Matthews is not liable for infringement. Having signed the license agreement as president of Lucerne he is not personally liable on the contract. *Centennial Insurance Co. v. Vic Tanny International*, 46 Ohio App.2d 137, 346 N.E.2d 330 (1975). Under these circumstances Mr. Matthews is not liable for the royalties and interest due Skil.

## THE FRENZEL PATENT

### Validity

The 1977 ruling of Judge Lambros, plus the fact Mr. Matthews was not made a party defendant until 1977, changed the circumstances from those in existence when the 1970 summary judgment was entered concerning the Frenzel patent. These changes are sufficient to permit the validity of Frenzel to be placed in issue.

■ Defendants contend that the Frenzel patent was obvious. The presumption of validity which attached to Frenzel is not applicable to the Skil Model 823 impact wrench prior art since this wrench was not considered by the Patent Office. *Eisele v. St. Amour*, 423 F.2d 135 (6th Cir. 1970); however, the only expert testimony provided was that of Mr. Gawron, who distinguished it from Frenzel. The defendants failed to challenge this testimony and failed to provide any expert testimony that either the Skil wrench or other pertinent prior art rendered Frenzel obvious to a mechanic of ordinary skill in the art. Under these circumstances the following caution in *Kardulas v. Florida Machine Products Company*, 438 F.2d 1118, 1124 (5th Cir. 1971), applies:

> Defendant put on no expert testimony. Before a court concludes that it has no need for expert testimony to examine the nature of the prior art or the level of skill in the relevant industry, it should be convinced the claim invention would have been obvious even to ordinary laymen of modest intelligence. . . . To substitute our own judgment concerning the obviousness of the device as of December 1960 "is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it" at that time.

The invention of the Frenzel patent relates to the relative position between the reversing lever and the trigger of a hand held tool. While the Frenzel patent does not appear overly complicated, this court is not convinced that the invention thereof would have been obvious even to ordinary laymen of modest intelligence.

The Frenzel patent is valid in all essential elements.

### Fraud on the Patent Office and Patent Misuse

■ Defendants have failed to show that the necessary elements of materiality and fraudulent intent (discussed in detail concerning the Gawron patent) were present to constitute fraud on the Patent Office during Skil's prosecution of the Frenzel patent. The failure to cite the Skil Model 823 impact wrench as prior art was not shown to be a deliberate misrepresentation. *See RPTZ-Patco, supra.*

Defendants' patent misuse allegations must also fail, for many of the same reasons set forth with reference to the Gawron patent. There was no discernible pattern or practice of tying the Frenzel invention to any product in the sales of Skil products to J. C. Penney, nor was there evidence to show the Frenzel patent influenced pricing policy.

### Devices Covered by the Frenzel Patent

The Model A reversing switch literally infringes Frenzel, thus is covered by the Frenzel license. The major issue concerns Model B.

■ An invention is construed not only in light of the patent claims, but also with reference to the patent specification, drawings, and file wrapper history. *See, Grahm, supra; Autogiro Company of America v. United States,* 384 F.2d 391, 181 Ct.Cl. 55 (1967); *Tilotson Manufacturing Co. v. Textron, Inc., Homelite,* 337 F.2d 833 (6th Cir. 1964); *Moon v. Cabot Shops, Inc.,* 270 F.2d 539 (9th Cir. 1959), *cert. denied,* 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546; *Thabet Mfg. Co. v. Kool Vent Metal Awning Corp.,* 226 F.2d 207 (6th Cir. 1955). Consideration of these various references leads to the conclusion that the Lucerne Model B reversing switch is not covered by the Frenzel patent, either literally or as an equivalent, for two basic reasons.

■ First, when a drill with the Model B switch is held and operated by the right hand the reversing lever is naturally, and most efficiently, operated by the right thumb. Since a limitation of Frenzel is that the trigger finger must engage and operate the reversing lever, the Model B switch does not come within Frenzel.

Second, a change of grip on the handle is necessary to permit the trigger finger to simultaneously touch both the trigger and the Model B reversing lever, which negatives the requirement of Frenzel that the finger operating the trigger simultaneously engage or operate the reversing lever. The trigger finger can no longer operate the trigger within the meaning of Frenzel if the normal operating grip has been changed.

### Relief

When simple interest is computed to the royalties due on the Model A reversing switch under the Frenzel license the total is one thousand five hundred eighty-nine dollars ($1,589.00). Under the license agreement this sum is owed to Skil by Lucerne.

Mr. Matthews is not liable to Skil under the Frenzel license agreement for the same reason set forth with reference to the Gawron patent.

### SUMMARY

The Gawron patent is valid and enforceable. The Lucerne TSC 113/114 and TSC 254 speed control devices are covered by the Gawron patent. The 1965 Skil-Lucerne license agreement with reference to the Gawron patent remains in effect. None of the defendants has infringed the Gawron patent. Lucerne remains liable to Skil under the terms of the license agreement for royalties plus interest totaling two hundred ninety-two thousand four hundred ninety dollars ($292,490.00). Mr. Matthews is not liable to Skil on this agreement or on any other basis. The corporate defendants other than Lucerne are not liable to Skil on this agreement or on any other basis.

The Frenzel patent is valid and enforceable. The Lucerne Model A reversing switch is covered by the patent, but the Lucerne Model B reversing switch is not covered by the patent. Lucerne is liable to Skil under the license agreement for royal-

ties plus interest due totaling one thousand five hundred eighty-nine dollars ($1,589.00). Mr. Matthews is not liable to Skil under this license agreement or on any other basis.

Lucerne is liable to Skil on the two patents combined for a total amount of two hundred ninety-four thousand seventy-nine dollars ($294,079.00), while none of the other defendants are liable to Skil.

## ORDER AND REPORT AND RECOMMENDATION

JACK B. STREEPY, United States Magistrate.

Defendants have filed a motion requesting reconsideration of a memorandum and order entered by the magistrate in this consolidated action, filed March 14, 1979 (hereafter referred to as "Order"). Said Order is incorporated by reference as if fully rewritten herein, except as it may be modified by this report and recommendation.

The Order accomplished the following: (1) it formally severed the antitrust issues which were introduced (by way of 1977 counterclaims) into this patent case from those issues which were tried before the magistrate in 1978 as a master; and (2) it terminated a previously issued 1977 order which had stayed all proceedings as to the antitrust counterclaims.

Defendants seek to have the Order of March 14, 1979 rescinded, thus reinstating the previous stay order, pending final outcome of the issues already tried by the magistrate. They also object to the method of severing the antitrust actions from the patent case since they fear that the requirement of filing a new antitrust action may raise new issues of jurisdiction and venue. Defendants further point out that although the parties consented to have the patent issues tried before the magistrate as a master they did not consent to such authority concerning defendants' antitrust actions.

While it appears that the argument concerning the magistrate's authority to issue the Order of March 14, 1979 is dubious, it is the better part of caution if that Order is rescinded and converted into a report and recommendation. It is so ordered.

Addressing the merits of the issues raised by the defendants, it does not appear that they object to severing the antitrust claims from the already tried patent issues, but do object to the method of severance. Refiling the antitrust counterclaims as a new civil action does not alter the substantive rights of the defendants in existence at the time they filed the antitrust counterclaims. Indeed, as plaintiff concedes "the substantive rights will not be affected by refiling." (Plaintiff's Memorandum In Response, filed April 2, 1979, at p. 4.) It is recommended that the antitrust action of the defendants be severed in the manner set forth in the March 14, 1979, Order, with the additional ruling that the substantive rights of the parties as they existed when the antitrust counterclaims were filed shall not be affected by the refiling, including whatever rights existed concerning venue and jurisdiction.

Plaintiff notes that there was a previous severance, ordered in 1973, in this action, which should be treated in the same manner as the antitrust counterclaims. Since the 1973 order of severance predated reference of the other patent issues to the magistrate, no recommendation is made herein regarding those matters.

The remaining issue is whether the previously issued stay order concerning the antitrust issues should be terminated. Defendants contend the stay order should remain in effect until "final outcome" of the patent issues tried before the magistrate. Since defendants note that the issues already tried will undoubtedly be appealed to the Sixth Circuit Court of Appeals, reinstatement of the stay order may envision a number of years. The antitrust issues have already been stayed for nearly eighteen months. Although defendants object to terminating the stay, it is noted that no objection has been made by plaintiff. Once the stay is terminated plaintiff must file responsive pleadings or motions to the antitrust claims, after they have been refiled. The burden of refiling the antitrust claims is merely mechanical, while the burden of

responding thereto will require legal and factual research by the plaintiff. Terminating the stay will expedite eventual trial. If defendants feel the already tried issues should be finally determined before trial on the antitrust issues they may move for a stay once all the antitrust pretrial discovery and other proceedings are completed. Whether to grant the stay can be determined based upon the then existing circumstances. Under the current circumstances it is recommended that the stay order be terminated.